2016 IL App (1st) 140046

FIFTH DIVISION
March 18, 2016

No. 1-14-0046

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12 CR 16053 |
| | ) | |
| DANIEL GUJA, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Thaddeus L. Wilson, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Gordon and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial in the circuit court of Cook County, defendant Daniel Guja was acquitted of attempted first degree murder, aggravated criminal sexual assault, aggravated criminal sexual abuse, burglary, and aggravated domestic battery, but was found guilty of domestic battery and unlawful restraint. Defendant was sentenced to two concurrent two-year terms in the Illinois Department of Corrections. On appeal, defendant argues: (1) defense counsel was ineffective for failing to include the affirmative defenses of necessity and self-defense in his answer to discovery in violation of Illinois Supreme Court Rule 413(d) (eff. July 1, 1982); (2) the trial court abused its discretion in denying his motion to amend the answer as a sanction for the discovery violation; and (3) certain fees and fines should be vacated or reduced.

Because we conclude defendant was not prejudiced by either defense counsel's failure to amend his answer to discovery or the trial court's denial of defendant's request to amend his answer, we affirm the judgment of the circuit court. We, however, modify the fees and fines assessed as provided herein.

¶ 2                                    BACKGROUND

¶ 3     The evidence at trial established that in the early morning hours of December 30, 2011, defendant and his then-girlfriend, Sandra Ortiz (Ortiz), began arguing. This argument escalated into a physical altercation, which left Ortiz with injuries. Ortiz was thereafter taken by ambulance to an emergency room where she was treated.

¶ 4     Defendant was subsequently indicted on 20 separate charges for attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)), aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4) (West 2010)), aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2010)), burglary (720 ILCS 5/19-1(a) (West 2010)), aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2010)), domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2010)), and unlawful restraint (720 ILCS 5/10-3(a) (West 2010)).

¶ 5     On September 13, 2012, the State filed a motion for pretrial discovery requesting in part written notice of any defenses defendant intended to assert at trial. On June 20, 2013, defense counsel filed an answer to the State's motion stating that defendant would "rely on the State's inability to meet its burden of proof." The answer did not list any affirmative or nonaffirmative defenses.

¶ 6     Defendant's bench trial commenced on September 18, 2013. During the opening statements, defense counsel asserted that Ortiz "started a fight and became violent with defendant." Defense counsel also stated that, while restrained by defendant, Ortiz attempted to

strike him. Defense counsel further argued that the bruises sustained by Ortiz demonstrated that she was restrained by defendant and that ultimately the evidence would demonstrate that defendant was not guilty.

¶ 7    Ortiz testified that she was 40 years old. At the time of the altercation, she was living in Chicago and dating defendant. The altercation occurred at a building owned by Ortiz located on North Milwaukee Avenue in Chicago. The first floor of the building was a commercial space she used to host parties, while the second floor was occupied by tenants. In the late evening of December 29, 2011, Ortiz, defendant, and some of her friends prepared the first floor of her building for a party.

¶ 8    At approximately 3 a.m. on December 30, 2011, Ortiz and defendant left the building to go to a nightclub, where they met other friends. While there, Ortiz consumed "a few drinks." When the nightclub closed at 4 a.m., Ortiz drove defendant back to her building. During the ride, defendant accused Ortiz of being interested in other men.

¶ 9    Defendant and Ortiz were arguing as they exited her vehicle. Ortiz informed defendant that he was not welcome in her building. Based on prior incidents, Ortiz believed the argument would escalate further, so she telephoned the police. While Ortiz was making the phone call, defendant seized the cell phone from Ortiz and removed the cell phone battery. According to Ortiz, the police arrived at her building approximately five minutes later. She spoke with the police and went inside. Defendant remained outside and continued to speak with the police.

¶ 10    When Ortiz believed defendant had departed, she went outside and walked across the street to speak with a woman named Marta who sold tamales from a stand. During the conversation, Ortiz observed defendant "popping his head out" from behind an automobile parked one-quarter of a block from her building. Ortiz testified that she used Marta's cell phone

to contact the police, but the police did not arrive.

¶ 11    Ortiz went back to her building and 30 minutes later began loading personal items into the automobile she planned to drive to her home in the suburbs.  As Ortiz attempted to reenter the building, defendant, who was hiding outside the door, pushed his way inside.  In doing so, defendant knocked Ortiz to the ground.  Ortiz attempted to stand up, but defendant knocked her down again, locked the door, and dragged her into the next room by her ankles.  Ortiz kicked and yelled, demanding that defendant leave the building.  Defendant then struck her in the head and face.  On cross-examination, Ortiz clarified that defendant punched her with a closed fist and slapped her on the side of the head, but not in the face.  Ortiz attempted to flee from the building, but defendant grabbed her, threw her over his shoulder, and slammed her body onto a granite countertop.  Ortiz further testified that she lost consciousness when her head struck the countertop.

¶ 12    When Ortiz regained consciousness, defendant was on top of her.  Defendant held her down and placed his hands over her mouth, restricting her breathing.  Ortiz then placed her hands inside defendant's mouth to get him to stop choking her.  Defendant got up while Ortiz remained on the floor crying and yelling at him to leave.

¶ 13    As Ortiz then attempted to crawl away from defendant, he grabbed her by the feet, pulled her towards him, and pulled her pants down.  It was then that defendant "shoved" his fingers in her anus.  Defendant proceeded to rip her blouse and brassiere, and grab her breasts.

¶ 14    Ortiz attempted to escape through the back door when defendant kicked an interior door down and it fell on her.  Defendant then threw a metal table on top of her.  As Ortiz was lying on the ground begging him to leave, defendant tried to take Ortiz's keys out of the pocket of the vest she was wearing.  After a struggle, defendant obtained the keys, declared, "I give up," and left.

¶ 15    Ortiz testified that after defendant left she went outside and yelled for help. One of her tenants, a man named Benjamin, came out of the building and waited with Ortiz until the police and an ambulance arrived and transported her to Norwegian American Hospital. Ortiz was treated at the hospital, but did not have any broken bones and was discharged later that afternoon.

¶ 16    According to Ortiz, during the struggle, which lasted from approximately 5 a.m. through 10:30 a.m., defendant grabbed her throat, pulled her hair, and "banged" her head into walls and the floor several times. Ortiz identified photographs of her injuries, which included scratches on her chest, and bruises on her face, lips, wrist, arms, hands, legs, and knees.

¶ 17    During her testimony Ortiz acknowledged that she did not immediately inform the ambulance crew or the police that defendant had inserted his fingers into her anus because her tenant was with her at the time and she was embarrassed. Ortiz, however, did inform them of this fact at the hospital. She also acknowledged that she had loaned defendant approximately $5,000 and had not been fully repaid. Ortiz denied consuming alcohol prior to visiting the nightclub and reiterated that she consumed only two or three alcoholic beverages while at the nightclub.

¶ 18    Ortiz additionally testified to two prior incidents of violence involving her and defendant which occurred in September 2011. During the first incident, defendant pushed her, but did not injure her. In the second incident, defendant struck her during an argument while they were traveling from Las Vegas to Chicago, bloodying her nose. The State also introduced into evidence a certified statement of defendant's December 2000 conviction for misdemeanor domestic battery.

¶ 19    Andrew Mueller (Mueller), one of Ortiz's tenants on the date in question, testified he was

awakened by a "commotion," including yelling, screaming and the sound of "the occasional thing breaking." He, however, "didn't think anything of it." Thereafter, Mueller decided to leave for work. He observed Ortiz standing across the street from the building conversing with "the lady that sells tamales every morning."

¶ 20    The parties stipulated to the testimony of four witnesses. The parties stipulated that if Francis Walsh (Walsh) was called as a witness, he would testify that he was employed by the Chicago fire department as an emergency medical technician and that he spoke with Ortiz at approximately 10:53 a.m. on December 30, 2011. According to Walsh, Ortiz reported that she was battered by her boyfriend for approximately two hours, including being beaten with fists, kicked, and dragged. Walsh would also testify that he did not record that Ortiz informed him defendant grabbed and twisted her breasts in his incident report.

¶ 21    The parties also agreed that Dany Jose (Jose), if called as a witness, would testify he was a registered nurse who treated Ortiz at Norwegian American Hospital on December 30, 2011. Ortiz's chief complaints were of back pain and a headache and that her back pain was initially an "8" on a scale of 0 to 10, but the pain later decreased to a "3." According to Jose, Ortiz stated she was assaulted by her boyfriend for several hours in her house. Jose observed several bruises to Ortiz's arms and chest. Ortiz indicated she was verbally and physically abused but initially denied any rape. Ortiz reported to Jose that she had informed a doctor that her boyfriend had penetrated her anus with his fingers. Jose observed contusions to Ortiz's left buttock, but did not observe anal abrasions or bleeding. Ortiz was discharged from the hospital on December 30, 2011.

¶ 22    Elizabeth Sisler (Sisler), if called as a witness, would testify she was a forensic scientist in the forensic biology section at the Illinois State Police Division of Forensic Sciences. She

received Ortiz's clothing and buccal standards from Ortiz and defendant. She observed damage to the construction of Ortiz's underwear and brassiere, but found no semen on either garment.

¶ 23    Lynnette Wilson (Wilson), a second forensic scientist in the same department, if called as a witness, would testify that a stain on the brassiere was subjected to DNA testing that revealed a mixture of DNA profiles consistent with having originated from two individuals. Wilson would also testify that one DNA profile was consistent with Ortiz and that defendant could not be excluded as a possible donor for the other DNA profile.

¶ 24    The State rested its case. Defense counsel moved for a directed finding, which the trial court granted as to the charges of attempted first degree murder, aggravated sexual abuse, and as to one count of aggravated criminal sexual assault. The trial was then continued by agreement until October 18, 2013.

¶ 25    At the outset of defendant's case, the parties stipulated to the testimony of an additional witness. The parties agreed that, if called as a witness, Chicago police officer Mark Kalamaris (Kalamaris) would testify that he responded to a radio call for assistance on North Milwaukee Avenue and spoke with Ortiz at approximately 10:41 a.m. on December 30, 2011. Officer Kalamaris recalled that Ortiz stated defendant punched and slapped her. He did not recall Ortiz informing him that she had been suffocated or choked. Officer Kalamaris also did not recall Ortiz informing him that she had lost consciousness during the fight, or that defendant had grabbed her breasts during the struggle.

¶ 26    Defendant testified on his own behalf that he was 35 years old. He met Ortiz in April 2011, while working at a nightclub where she was a patron. Defendant began working for Ortiz as a bouncer at her "after hours" club on North Milwaukee Avenue, and commenced dating Ortiz three weeks later. Defendant was aware that Ortiz did not have a liquor license for her "after

hours" club.

¶ 27    According to defendant, he and Ortiz had "a few drinks" on the evening of December 29, 2011, while preparing Ortiz's club for a series of parties for the New Year's weekend.  Defendant testified he also consumed "a few drinks" at the nightclub he and Ortiz visited thereafter, adding that Ortiz was also drinking alcoholic beverages.  When the nightclub closed, Ortiz invited a few patrons back to her "after hours" club.

¶ 28    Defendant further testified that while driving to Ortiz's building, he noticed that she appeared too intoxicated to host the party.  When they arrived at her building, defendant told Ortiz that she was not "stable" enough to host the party.  The couple began arguing.  Ortiz cancelled the party and continued to argue with defendant, ultimately telephoning the police. Defendant, who was on misdemeanor probation, left the area and walked three blocks to a nearby train station.  According to defendant, he remained at the train station for between 30 to 60 minutes before telephoning and transmitting text messages to Ortiz because he did not have his jacket or other belongings.  Defendant further testified that Ortiz ultimately agreed to permit him to return, collect his belongings and leave her building.

¶ 29    When defendant returned to the building, the police were outside.  Defendant approached the officers and explained the situation.  According to defendant, the police, observing that Ortiz was intoxicated and "acting crazy" and that he was also intoxicated, suggested that he leave the area and return later.  Defendant assured the police he would simply retrieve his belongings and leave.  He then knocked on the door of the building and was eventually admitted entry by Ortiz.

¶ 30    Defendant began packing his belongings, which included his clothing, DJ equipment, and bottles of alcohol.  Defendant testified his clothing was in 10 separate garbage bags and was mixed in with Ortiz's clothes, and thus it took a longer time to gather his belongings.  According

to defendant, he was no longer consuming alcohol at this time, but Ortiz was still drinking.

¶ 31    Ortiz and defendant began arguing, with Ortiz accusing defendant of providing free drinks to women at the nightclub.  Defendant explained he did so to promote Ortiz's "after hours" club.  Defendant testified that Ortiz "exploded into a rage," and threw an ashtray and a candle at him.  Ortiz started hitting him, telling him to get his clothes and "get the hell out."

¶ 32    Defendant "cussed" at Ortiz and "called her some names," at which point "[s]he went in a worst [*sic*] rage *** grabbed the Bicardi [*sic*] bottle and charged" at him with the bottle. Defendant grabbed Ortiz's hand and "gently" took her down to the ground to restrain and calm her.  After approximately a minute of holding Ortiz down, defendant testified, "Then I told her these exact words.  I said, b***, you are not going to make another dollar in these after hours." According to defendant, that meant he was going to inform the police of her unlicensed operation.  Defendant then left the building, informing Ortiz she could keep his clothes.  On cross-examination, defendant added that as he left the building, Ortiz replied that he "was going to jail."  Defendant further denied choking, punching, or kicking Ortiz.  Defendant also denied inserting his fingers into her anus.

¶ 33    On cross-examination, Defendant acknowledged he and Ortiz had arguments, including prior incidents where Ortiz had contacted the police, but denied he had ever been physically violent with her.  Defendant admitted he and Ortiz argued while traveling from Las Vegas to Chicago, but denied intentionally bloodying her nose.  According to defendant, he struck Ortiz with his elbow while trying to remove the keys from the automobile's ignition while he was seated in the rear of the vehicle.

¶ 34    Regarding the argument on December 30, 2011, defendant testified that he and Ortiz began arguing as they were exiting the automobile.  Defendant acknowledged he continued to

argue with Ortiz despite her history of contacting the police and his probationary status. He denied grabbing Ortiz's cell phone. Defendant clarified that after Ortiz charged at him, he took her down to the ground "not so gently," but he did not "slam" her to the ground.

¶ 35    Defendant further acknowledged that he spoke to a police detective following his arrest on July 29, 2012. Defendant did not recall whether he informed the detective that Ortiz threw an ashtray and a candle at him. Defendant also did not recall whether he informed the detective that Ortiz charged at him with a liquor bottle.

¶ 36    At the conclusion of the defense case, defendant's counsel moved to amend his answer to discovery to include the affirmative defenses of necessity and self-defense. The State objected, arguing that defense counsel had given the State no notice of the affirmative defenses although counsel had communications with defendant and would have known of the potential defenses. Defense counsel replied that the State could adduce evidence in rebuttal of the affirmative defenses. The trial court denied the defense motion to amend the answer, stating that "when there has been no affirmative defense alleged in the answer, then there would be an unfair surprise to the State in preparing its case to deal with an affirmative defense." The trial court added that the court also reviewed the answer before trial to prepare for the type of proof anticipated at trial. The defense rested.

¶ 37    In rebuttal, the State called Chicago police detective Joan Burke, who testified that she spoke with defendant on the date of his arrest. According to Detective Burke, defendant stated that the argument with Ortiz became "a bit physical," and that he held Ortiz down because she was going to contact the police. Detective Burke did not recall defendant stating that Ortiz threw an ashtray or charged at him with a liquor bottle, but she did recall defendant mention a candlestick. Detective Burke also testified that defendant stated he seized Ortiz's cell phone and

removed the battery to prevent her from contacting the police.

¶ 38    Following closing arguments, the trial judge found defendant guilty on the charges of domestic battery and unlawful restraint.  The trial judge, however, acquitted defendant of the remaining charges of aggravated domestic battery, burglary, and aggravated criminal sexual assault.

¶ 39    On November 5, 2013, defendant filed a posttrial motion for a new trial.  The posttrial motion asserted: (1) the evidence was insufficient to convict; and (2) the trial judge erred by denying the motion to amend the answer to discovery "to allege the affirmative defense of self-defense and defense of another."  On December 11, 2013, the trial judge denied defendant's posttrial motion and proceeded to a sentencing hearing.  After hearing arguments in aggravation and mitigation of the offense, the trial judge sentenced defendant to serve two concurrent terms of two years in the Illinois Department of Corrections.  In addition, the trial judge imposed several fees and fines, including a $20 preliminary hearing fee and a $100 fine for the Violent Crime Victims Assistance Fund.  On December 12, 2013, defendant filed a timely notice of appeal to this court.

¶ 40                                    ANALYSIS

¶ 41    On appeal, defendant argues: (1) defense counsel was ineffective for failing to include the affirmative defenses of necessity and self-defense in his answer to discovery in violation of Illinois Supreme Court Rule 413(d) (eff. July 1, 1982); (2) the trial court abused its discretion in denying his motion to amend the answer as a sanction for the discovery violation; and (3) certain fees and fines should be vacated or reduced.  We address each issue in turn.

¶ 42                         Ineffective Assistance of Counsel

¶ 43    Defendant asserts defense counsel was ineffective when he failed to file an answer

notifying the State of the affirmative defenses he intended to raise. According to defendant, this failure to comply with Illinois Supreme Court Rule 413(d) (eff. July 1, 1982) fell below the level of reasonable representation. Defendant maintains that defense counsel intended to assert these defenses, as demonstrated by counsel's opening statement, but that he failed to properly notify the State of his intent. Defendant contends he was prejudiced by defense counsel's deficient performance because, as a result, the trial court excluded his affirmative defenses of necessity and self-defense.

¶ 44    In response, the State argues that defense counsel's failure to give notice of the affirmative defenses constituted reasonable trial strategy, particularly where he stated in his answer to discovery that he intended to rely on the State's inability to prove its case. The State remarks that defense counsel's strategy was, in fact, successful in achieving acquittal on all but two of the counts asserted against defendant. According to the State, even if defense counsel's performance was deficient, defendant was not prejudiced as there was ample evidence in support of his domestic battery and unlawful restraint convictions.

¶ 45    A defendant has a sixth amendment right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. An accused is entitled to capable legal representation at trial. *People v. Wiley,* 165 Ill. 2d 259, 284 (1995). To establish a claim of ineffective assistance of counsel, a defendant must prove both (1) deficient performance by counsel and (2) prejudice to defendant. *People v. Smith,* 195 Ill. 2d 179, 187-88 (2000) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). To satisfy the first prong of the *Strickland* test, a defendant must demonstrate his counsel's performance fell below an objective standard of reasonableness, as measured by prevailing norms. *Smith,* 195 Ill. 2d at 188. "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action

or inaction was the result of sound trial strategy." *People v. Perry,* 224 Ill. 2d 312, 341-42 (2007). To satisfy the second prong, prejudice is demonstrated if there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *People v. Albanese,* 104 Ill. 2d 504, 525 (1984); *People v. Echols,* 382 Ill. App. 3d 309, 312 (2008). A probability rises to the level of a " 'reasonable probability' " when it is " 'sufficient to undermine confidence in the outcome' " of the proceeding. *People v. Peeples,* 205 Ill. 2d 480, 513 (2002) (quoting *Strickland,* 466 U.S. at 694). The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *Peeples*, 205 Ill. 2d at 513. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *Albanese*, 104 Ill. 2d at 527.

¶ 46    Regardless of whether trial counsel's failure to assert the affirmative defenses of necessity and self-defense was deficient, we do not believe that defendant incurred any prejudice at trial as a result of the claimed error. In order to raise an affirmative defense, the defendant is required to present some evidence on the issue unless the State's evidence raises the issue. 720 ILCS 5/3-2(a) (West 2010). Once an affirmative defense has been raised, the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue. 720 ILCS 5/3-2(b) (West 2010). The record discloses the State did not present evidence as to the affirmative defenses of necessity and self-defense. Therefore, defendant must present "some evidence" in support of his claim. *People v. Kratovil*, 351 Ill. App. 3d 1023, 1033 (2004). While the threshold of establishing some evidence is relatively low (see *People v. Kite*, 153 Ill. 2d 40, 45 (1992)), the evidence deemed to be adequate to raise an affirmative defense must be evidence sufficient to raise a reasonable doubt as to the defendant's guilt. *People v. Govan*, 169 Ill. App.

3d 329, 336 (1988) (citing *People v. White*, 78 Ill. App. 3d 979, 981 (1979)).

¶ 47     Here, defense counsel, at the close of defendant's case, sought to amend the answer to include the defenses of necessity and self-defense.  The defense of necessity involves the following elements:  (1) the person claiming the defense was without blame in occasioning or developing the situation; and (2) the person reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might have reasonably resulted from his own conduct.  720 ILCS 5/7-13 (West 2010); *Govan*, 169 Ill. App. 3d at 336.  The defense of necessity applies when the threat of harm was immediate, and defendant's conduct was the sole option to avoid injury.  *People v. Azizarab*, 317 Ill. App. 3d 995, 998-99 (2000); see *Kratovil*, 351 Ill. App. 3d at 1034 ("Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances." (citing *People v. Henderson*, 223 Ill. App. 3d 131, 136 (1991))). The defense of necessity "is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable, and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *People v. Janik*, 127 Ill. 2d 390, 399 (1989).  In our view, the record does not contain even "some evidence" which would satisfy these requirements.

¶ 48     Under the first prong of the necessity defense, there was no evidence that defendant was without blame in occasioning the situation.  Defendant himself testified that he "cussed" at Ortiz and "called her some names" causing her to go into a "rage."  Defendant further testified that, while holding Ortiz down on the floor, he called her a b*** and threatened to tell the authorities about her unlicensed "after hours" club.  The evidence, including defendant's testimony, established that over the course of the argument defendant was not just an innocent bystander,

but also prompted the escalation of the argument and the physical altercation.

¶ 49   Defendant further fails to satisfy the second prong of the necessity defense.  In reviewing this element of the defense we consider whether defendant's conduct constitutes the "sole reasonable alternative" available to him under the circumstances.  See *People v. Perez*, 97 Ill. App. 3d 278, 281 (1981).  The evidence here established defendant did not have a reasonable belief that his actions were the "sole reasonable alternative."  Under the circumstances, defendant had available other courses of action that were less harmful.  The record reveals that the argument between defendant and Ortiz lasted over several hours, providing defendant with ample opportunity to withdraw from the argument. Additionally, when the argument escalated to where, according to defendant, Ortiz "charged" at him with a Bacardi bottle, defendant could have left the building.  In fact, defendant could have heeded the officers' advice and not returned to the building at all that evening.  In sum, because defendant had reasonable alternatives other than bringing Ortiz down to the ground and restraining her, the defense of necessity was therefore unavailable to him as a matter of law.  See *Kratovil*, 351 Ill. App. 3d at 1034.

¶ 50   In further support of the lack of evidence to establish the second prong of the necessity defense, the record discloses that defendant actually caused more harm to Ortiz than he sought to prevent.  Ortiz testified that after their struggle on the ground, defendant kicked an interior door, which fell on top of her, and that defendant threw a metal table at her.  In fact, the evidence indicated Ortiz was taken by ambulance to the emergency room and treated for the injuries she sustained.  In contrast, defendant testified that Ortiz physically struck him and threw an ashtray and candle at him.  Defendant, however, did not produce any evidence that the ashtray or candle struck him or that he was injured as a result of Ortiz's conduct.  The trial court, in finding defendant guilty of domestic battery and unlawful restraint, found Ortiz more credible than

defendant. See *People v. McGrath*, 193 Ill. App. 3d 12, 28 (1989) (determinations involving the credibility of the witnesses, the weight their testimony should be given, and the reasonable inferences to be drawn from the evidence presented are the responsibilities of the circuit court at a bench trial). Thus, according to Ortiz's testimony, the injuries defendant inflicted upon Ortiz caused her greater harm than defendant's act of "restraining" Ortiz on the floor.

¶ 51 As the defense of necessity was unavailable to defendant as a matter of law, it therefore follows that defendant was not prejudiced by defense counsel's failure to assert the defense. See *Kratovil*, 351 Ill. App. 3d at 1034. Consequently, there is no evidentiary support for this claim of ineffective assistance of counsel. See *People v. Davis*, 16 Ill. App. 3d 846, 849 (1974) (finding no ineffective assistance of counsel where no evidence of the defense of necessity existed).

¶ 52 Defendant was also not prejudiced by trial counsel's failure to amend the answer to include the affirmative defense of self-defense. The Illinois self-defense statute states that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2010). In order for a claim of self-defense to be proper, "the defendant must establish some evidence of each of the following elements: (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries,* 164 Ill. 2d 104, 127-28 (1995); *People v. Holman*, 2014 IL App (3d) 120905, ¶ 57. If the State negates any of these elements, the defendant's claim of self-defense must be rejected. *People v. Lee,* 213 Ill. 2d 218, 225 (2004). Further, if the defendant responds to a confrontation with such excessive force that he is no

longer acting in self-defense but in retaliation, the excessive use of force renders the defendant the aggressor, even if the other person involved actually commenced the confrontation. *People v. Belpedio,* 212 Ill. App. 3d 155, 161 (1991).

¶ 53    In this case, Ortiz's testimony established that she was not the initial aggressor. Defendant, who had been instructed by police officers to leave the area, instead hid outside Ortiz's door, pushed his way inside and in doing so knocked her to the ground. When Ortiz attempted to stand up, defendant pushed her down again and then dragged her into the next room by her ankles. It was then that defendant began slapping Ortiz in the head and punching her with a closed fist. Ortiz's testimony, which was corroborated by photographs of Ortiz and of the rooms where the incident occurred, established that defendant was the aggressor and Ortiz was the victim. See *People v. Grayson*, 321 Ill. App. 3d 397, 402 (2001).

¶ 54    Furthermore, even if Ortiz was the initial aggressor, the right of self-defense does not permit one to pursue and inflict injury upon even an initial aggressor after the aggressor abandons the quarrel. *Holman*, 2014 IL App (3d) 120905, ¶ 58; *Belpedio*, 212 Ill. App. 3d at 161. "If one responds to a confrontation with such excessive force that one is no longer acting in self-defense but in retaliation, the excessive use of force renders one the protagonist; a nonaggressor has a duty not to become the aggressor." *Belpedio*, 212 Ill. App. 3d at 161.

¶ 55    Here, the evidence demonstrated that from the moment Ortiz lost consciousness, she was lying on the ground until defendant left the building. Ortiz's testimony established: that defendant was on top of her with his hands over her mouth; that when she attempted to crawl away, defendant grabbed her; and that defendant threw a metal table on top of her. Throughout the altercation Ortiz consistently demanded that defendant leave the building, but instead he continued to attack her. There was absolutely no evidence that defendant sustained any injuries

during the incident. Thus, the record establishes that Ortiz had abandoned the quarrel after being knocked unconscious and that defendant, in retaliation, used excessive force. As the evidence fails to support the affirmative defense of self-defense, defendant was not prejudiced at trial where his counsel failed to assert the affirmative defense. See *People v. Wells*, 346 Ill. App. 3d 1065, 1074 (2004) (defendant not prejudiced by trial counsel's failure to fully develop a self-defense theory where the evidence did not support such a defense).

¶ 56    In sum, defendant has failed to establish that there is a reasonable probability that the result of the trial would have been different had he been allowed to assert the affirmative defenses of necessity and self-defense. Accordingly, his claim of ineffective assistance of counsel fails.

¶ 57                                    Abuse of Discretion

¶ 58    Defendant argues the trial court erred when it "completely barred" him from raising any affirmative defenses due to his attorney's failure to include those defenses in his answer to discovery. At oral argument before this court defendant clarified his position, asserting that the trial court's error was its failure to consider whether he was legally justified in his actions against Ortiz.

¶ 59    The Illinois Supreme Court Rules require a defendant to disclose to the State any defenses that he intends to present at trial. Specifically, Illinois Supreme Court Rule 413(d) (eff. July 1, 1982) provides in pertinent part that, "[s]ubject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial." The Illinois Supreme Court Rules also provide the trial court with the authority to impose sanctions against a defendant who fails to disclose his affirmative defenses. Specifically, Illinois Supreme Court Rule 415(g)(i)

18

(eff. Oct. 1, 1971) permits the court to impose sanctions for violations of the discovery rules. According to that rule, if at any time during the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule, "the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." *Id.*

¶ 60    "A trial court's decision as to the appropriate sanction for a discovery violation is subject to review for abuse of discretion." *People v. Ramsey*, 239 Ill. 2d 342, 429 (2010). "An abuse of discretion exists only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Id.* The exclusion of undisclosed evidence or defenses does not necessarily constitute an abuse of the trial court's discretion. See *People v. Wright*, 2013 IL App (1st) 103232, ¶ 68 (citing cases upholding exclusion as a sanction). The defendant has the burden of demonstrating prejudice as a result of the imposition of an improper sanction. *Ramsey*, 239 Ill. 2d at 428; see *People v. Brown*, 89 Ill. App. 3d 852, 857 (1980).

¶ 61    As previously discussed, defendant was not prejudiced by trial counsel's failure to assert his affirmative defenses. See *Brown*, 89 Ill. App. 3d at 857 (a trial court's discretion "will only be reviewed upon defendant's showing of prejudice"). In so concluding, we stated defendant failed to set forth even "some" evidence to establish such defenses. See 720 ILCS 5/3-2 (West 2010); *Jeffries*, 164 Ill. 2d at 127. Accordingly, defendant cannot demonstrate prejudice where no evidence was presented to support the affirmative defenses the trial court ultimately excluded. Because defendant has failed to demonstrate he was prejudiced, this claim on appeal fails.

¶ 62    Moreover, defendant's assertion that the trial court did not consider the evidence that he

was legally justified in his actions is belied by the fact the trial court is presumed to know the law and follow it accordingly. See *People v. Thorne*, 352 Ill. App. 3d 1062, 1078 (2004). In addition, the defense was not prohibited from presenting any evidence as a result of the trial court's denial of the motion. In fact, in a bench trial it is presumed that the trial judge has considered the evidence in reaching his verdict. *People v. Gilbert*, 68 Ill. 2d 252, 258 (1977). While this presumption may be rebutted where the record affirmatively demonstrates the contrary (*id.* at 258-59), we are of the opinion that the record before us does not contain such a showing.

¶ 63    Defendant relies on the cases of *People v. Houser*, 305 Ill. App. 3d 384 (1999), *People v. Gracey*, 104 Ill. App. 3d 133 (1982), and *People v. Foster*, 271 Ill. App. 3d 562 (1995); however, these cases are factually distinguishable from the case at bar. In *Houser*, defense counsel sought to add a necessity defense on the morning of jury selection. *Houser*, 305 Ill. App. 3d at 388. The reviewing court noted that the defendant had already asserted the defense of compulsion, which were "closely linked, sharing the same factual basis" and, thus, held under the circumstances unfair prejudice to the State was "not a foregone conclusion." *Id.* at 392.

¶ 64    In *Gracey*, at the conclusion of the State's case-in-chief, the trial court granted the State's motion to preclude the defense from raising any affirmative defenses at trial. *Gracey*, 104 Ill. App. 3d at 135. The court, however, allowed the defendant to present evidence on the issues of intoxication and self-defense, but refused to instruct the jury concerning those issues. *Id.* The reviewing court found no fault with the actions taken by the trial court, but found defendant was substantially prejudiced "because the jury was not instructed as to the legal significance of any findings it might make based on this evidence." *Id.* at 137.

¶ 65    In *Foster*, on the morning of a jury trial, the State objected to any affirmative defenses

20

that the defendant might raise due to his failure to comply with a prior discovery order. *Foster*, 271 Ill. App. 3d at 564. The trial court barred the defendant from presenting a defense and, as a result, the defendant presented no evidence. *Id.* at 565-66. On appeal, the *Foster* court stated the trial court's sanction "literally stopped him from presenting any defense for the jury's consideration" and found the sanction to be too harsh warranting a new trial. *Id.* at 567, 569-70. In addition, the *Foster* court found defense counsel's "chronic failure to comply with discovery orders" constituted a "willful violation" of Rule 415(g) and that the trial court should have considered these facts and sanctioned defense counsel personally instead of barring the defendant's defense. *Id.* at 567-68.

¶ 66    *Houser*, *Gracey*, and *Foster* all involved jury trials where the issue of whether defendant could assert affirmative defenses occurred on either the day of trial or at the close of the State's case. See *Houser*, 305 Ill. App. 3d at 391; *Gracey*, 104 Ill. App. 3d at 137; *Foster*, 271 Ill. App. 3d at 564. Additionally, in *Gracey*, the defendant was prejudiced because the jury was not apprised of the legal significance of their findings. *Gracey*, 104 Ill. App. 3d at 137. Because the evidence here was heard and considered by the trial judge, and not a jury, there was no concern that the legal significance of the evidence presented would be missed. See *Thorne*, 352 Ill. App. 3d at 1078 (the trial court is presumed to know the law and follow it accordingly). Thus, due to defendant's decision to proceed with a bench trial, the trial judge's ruling did not implicate jury instructions or necessarily impact the legal significance of defendant's testimony. See *cf. Gracey*, 104 Ill. App. 3d at 137. Furthermore, the court in *Foster* found defense counsel's discovery violation was willful. *Foster*, 271 Ill. App. 3d at 568-69. There was no such finding here.

¶ 67    While defendant argues that *Houser*, *Gracey*, and *Foster* all stand for the general

21

principle that, before imposing a sanction the trial court has a duty to consider other, less restrictive alternatives, the record here discloses the trial court did consider other such alternatives. During arguments on this motion, defense counsel asserted that instead of prohibiting the defenses, the State be allowed to put on evidence in rebuttal. Defense counsel, however, conceded that "the only other witness that would serve to rebut the defense" was Ortiz who had already testified. Having already heard all of the evidence in the State's and the defense's cases-in-chief, the trial court was well aware that the only witnesses to the altercation were defendant and Ortiz. With defense counsel's suggestion in mind, the trial court, in its discretion, denied defendant's motion. In sum, we are unable to find error where defendant failed to demonstrate he was prejudiced. Accordingly, the trial court did not abuse its discretion in denying defendant's motion to amend the answer as a sanction for the discovery violation.

¶ 68                                        Fees and Fines

¶ 69    Defendant argues his preliminary hearing fee (55 ILCS 5/4-2002.1(a) (West 2010)) should be vacated and the Violent Crime Victims Assistance Fund fine (725 ILCS 240/10(b) (West 2010)) should be reduced from $100 to $28. The State agrees. The propriety of the imposition of fines and fees by the trial court is a question of law, which we review *de novo*. *People v. Anthony*, 2011 IL App (1st) 091528-B, ¶ 19. It is undisputed that defendant was indicted and, therefore, did not receive a probable cause hearing. See *People v. Smith*, 236 Ill. 2d 162, 174 (2010) (preliminary hearing fee was improperly charged where probable cause hearing was never conducted). Additionally, the statute authorizing a $100 fine for the Violent Crime Victims Assistance Fund was not in effect when defendant committed the offense. See 725 ILCS 240/10(b) (West 2012) (authorizing a $100 fine effective July 16, 2012, for offenses committed on or after July 1, 2012). Accordingly, we vacate the preliminary hearing fee and

order the Violent Crime Victims Assistance Fund fee be reduced to $28. See *People v. Jamison*, 229 Ill. 2d 184, 193 (2008).

¶ 70                                CONCLUSION

¶ 71    For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County and order the fines and fees to be modified in accordance with this order.

¶ 72    Affirmed as modified.