2021 IL App (1st) 190831-U

No. 1-19-0831

Order filed August 5, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 DV 62483 |
| | ) | |
| MARK EVANS, | ) | Honorable |
| | ) | Tommy Brewer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for domestic battery is affirmed where the evidence showed that defendant initiated an altercation with the complainant and bit her nose and wrist in the process.

¶ 2    Following a bench trial, defendant Mark Evans was found guilty of the domestic battery of Phylicia Hampton (720 ILCS 5/12-3.2(a)(2) (West 2018)) and sentenced to six months' conditional discharge. The court issued a plenary order of protection against Evans which was to remain in effect for three months. On appeal, Evans argues that the State failed to prove him guilty

beyond a reasonable doubt, where the evidence at trial demonstrated that he acted in self-defense and the State's key witness was not credible. We affirm.[1]

¶ 3                                    I. JURISDICTION

¶ 4      The trial court sentenced Evans on April 10, 2019 and on that same date, Evans filed a timely notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, §6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case.

¶ 5                                    II. BACKGROUND

¶ 6      Evans was charged by misdemeanor complaint with domestic battery, following an incident in Hazel Crest, Cook County, on November 1, 2018, where he "knowingly and without legal justification, caused bodily harm to his girlfriend Hampton, by biting her on the nose and wrist while having a physical fight."

¶ 7      Hampton testified that, on November 1, 2018, she was dating Evans and was at his residence on the 17000 block of South Albany Avenue. Hampton spent the night there and woke up around 9 a.m. to prepare for a job interview. Evans argued with Hampton because he wanted her to contribute more to household expenses. As Hampton sat sideways in a chair putting on her shoes, Evans flipped the chair, so that her back was on the ground and her legs were resting on the side of the chair. Evans slapped her face "nonstop very fast." In an attempt to block Evans, Hampton picked up a space heater from the floor, and told Evans, "I just want to collect my items

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

and get out of [the] house." Evans choked Hampton with both of his hands around her throat, shook her, and "tossed [her] around the room." Hampton could not breathe and slipped in and out of consciousness. Once Evans stopped, Hampton put the space heater down and prepared a canister of mace. Evans retrieved a pocketknife, and the two struggled over the knife, which nicked one of Hampton's fingers. During the struggle Evans bit her wrist and nose. Eventually, Evans cut himself on the knife, let the knife go, and "left [her] alone."

¶ 8     Less than one minute later, Hampton called the police. During that day and the next, she took photographs of her injuries, which the State entered into evidence. Hampton testified that the photographs depicted her "bloody lip" from when Evans slapped her face, bite marks on her nose that became "puffed up and infected," inflammation on her wrist, and the nick on her finger.

¶ 9     The State also admitted into evidence and published an audio recording of Hampton's 911 call and the parties stipulated to the foundation for the recording. In the recording, which we have reviewed, Hampton told the dispatcher, "My boyfriend just assaulted me." She confirmed that her boyfriend was still there and denied that she needed an ambulance but stated "he might need one" because "he cut himself on a knife." Hampton also confirmed that her boyfriend still had a knife and stated that she was in the living room and her boyfriend was in his bedroom. When the dispatcher asked Hampton if her boyfriend intentionally cut himself and was attempting suicide, she answered in the affirmative. A man can be heard speaking in the background, and Hampton states, "He's on the phone with 911 right now, trying to say that I did the stuff." She then told the dispatcher, "He's telling the police that I cut him." The dispatcher later states she is going to page an ambulance.

¶ 10    On cross-examination, Hampton clarified that she picked up the space heater to prevent Evans from attacking her while she gathered her belongings. She acknowledged that during the altercation, she scratched Evans's neck and broke his skin, but she denied causing him a finger injury. Rather, she testified that Evans cried, said "he didn't want to live anymore," and cut himself. After Evans "attacked" her, he asked her to leave his apartment and continued "attacking" her as she attempted to leave. Hampton discharged her mace at a wall that morning but did not discharge it "anywhere near" Evans because she had never used it before. She identified a photograph of the injuries she caused to Evans's neck. She testified that another photograph, depicting a cut on a finger, was not Evans's knife injury, which was "in the middle of his hand." She also stated the "little nick" in the photograph was not "what [she] called 911 for," as she called 911 because Evans "was profusely bleeding from the middle of his hand."

¶ 11    Police officers arrived and arrested Evans. Hampton spoke with the police officers but she could not remember telling the officers that Evans flipped her chair. However, she was "pretty sure" she told them Evans slapped her face because her lips were bloody and the officers asked her about her lips. She did not tell the officers that Evans choked her or that she lost consciousness. Hampton testified that the officers asked her "specific questions" and she gave "specific answers." She told the officers that Evans nicked her finger with the knife and testified, "I told them everything. I showed them my finger, too." Hampton also informed the officers that she used the mace. She confirmed that during her 911 call, Evans could be heard in the audio recording speaking on the phone with police and had a wrap on his finger because it was bleeding.

¶ 12    On redirect examination, Hampton acknowledged there was "mutual tussling" that morning, but Evans "came at" her first and the knife belonged to him.

¶ 13    Hazel Crest police officer Alicia Pennington testified that, on the date in question, she responded to a domestic disturbance call and spoke with Hampton. Hampton informed Pennington that she and Evans "were tussling, and she got a bruise or scratch or something on her lip." Pennington reviewed the police report and stated that she observed scratches on Hampton's arms and hands.

¶ 14    On cross-examination, Pennington stated she could not recall whether Hampton told her Evans flipped a chair she was sitting on. Pennington confirmed the report did not state Evans slapped or choked Hampton. The report also did not note any knife injuries to Hampton's finger. Pennington could not recall observing any injuries on Evans's finger or palm, and she recalled "someone had a scratch on the neck," but could not recall who.

¶ 15    Evans testified that on November 1, 2018, about 9 a.m., he engaged in an argument with Hampton in his apartment. After about four or five minutes, the argument became "physical." Evans was in his bed, and Hampton was standing in his room "getting angrier and escalating." Evans repeatedly told Hampton to leave, but Hampton refused. Evans stood up and loudly asked Hampton to leave again, and Hampton screamed "no," "came at" him, and scratched his neck. Hampton repeatedly cursed at him and told him she was not going to leave. She picked up a space heater and held it "as if she was going to strike [him] with it." Evans told her to put the space heater down and leave, but Hampton said she would not put it down until she "got some licks." Eventually, Hampton put the space heater down and picked up Evans's pocketknife from his dresser. She opened the knife and pointed it at him. Evans told Hampton she was "crazy" and needed to leave. He walked out of his bedroom and onto his apartment's front balcony and closed the balcony's sliding door behind him to smoke a cigarette.

¶ 16    After about 10 seconds, Hampton opened the door, pointed a mace canister at Evans's face, and threatened to mace him. Evans "cower[ed]," covered his face, and walked into the house. Hampton told him she had used her mace before and knew how to use it, and she turned and sprayed a wall. He denied that Hampton sprayed the mace at him. Evans told her to leave and to never call him again. He told her he did not love her anymore and that he "didn't want anything to do with her ever again." Evans attempted to walk away once again, but Hampton approached him. Hampton yelled and cursed with the knife in her left hand and the mace in her right hand, about one or two feet from him. Evans testified that "it looked like she was coming to stab [him]," so he grabbed her left hand with his right hand and held the knife, and then also grabbed her right hand. Evans testified he was trying to defend himself because he was worried he would be stabbed. The two "tussl[ed]" and fell onto a couch, and Evans cried and pleaded for Hampton to let go of the knife. However, Hampton screamed "no" and moved the knife closer towards him.

¶ 17    Evans bit Hampton's left wrist and nose so she would let go of the knife. He eventually removed the knife from Hampton's hand and the side of his finger was "sliced" in the process. Evans closed the knife and threw it across the room. He told Hampton she went "too far" and said, "You assaulted me, and I'm calling the police." Evans went to his bedroom and called the police. When he exited his room, Hampton was still in his apartment and on the phone. The police arrived and arrested Evans.

¶ 18    The defense presented photographs taken the next day while Evans was in a courthouse lockup. Evans confirmed that one photograph depicted scratch wounds on his neck inflicted by Hampton, and other photographs depicted the laceration on his finger. Evans denied that he flipped

a chair Hampton was sitting in, slapped her face, choked her, or stated that he wanted to commit suicide.

¶ 19 On examination from the court, Evans testified he and Hampton were arguing that day about him "supposedly being a cheater." Evans also confirmed that his voice could be heard on the audio recording of the phone call submitted by the State. He testified that he said in the recording, "[M]y girlfriend is here, and she's assaulted me, and she's cut me. And I've asked her repeatedly to leave and she would not leave. I need them to come and physically remove her."

¶ 20 On cross-examination, Evans denied that he ever "moved towards [Hampton] in a violent manner," but confirmed there was a "tussle" in the front room later. He did not know who called the police first, as he left the room to get his phone. He testified Hampton called the police because he was reporting her to the police. Evans testified, "I didn't mean to assault her."

¶ 21 The court found Evans guilty of domestic battery. In announcing its ruling, the court noted that Hampton's testimony was consistent and credible, and Hampton "described an event where Mr. Evans got upset and *** attack[ed] her." The court then recounted that Evans "start[ed] by first flipping her out of a chair and by slapping her multiple times" and then "[s]trangling her," and she attempted to defend herself with mace. The court further noted that if Hampton were the aggressor, "she would have sprayed the mace on him and not the wall," and that Hampton "stayed around for the police" and "didn't try to flee." The court did not believe Evans's version of the events and noted that Evans "said that there is a scuffle, and he just walks away to the balcony and smokes a cigarette. And that [Hampton] comes to the balcony with mace when she has a knife in her hand to threaten him with mace."

¶ 22    After a hearing, the court sentenced Evans to six months' conditional discharge, and issued a plenary order of protection against Evans to remain in effect for three months.

¶ 23                                    III. ANALYSIS

¶ 24    On appeal, Evans argues the State failed to prove him guilty beyond a reasonable doubt, where the evidence showed he acted in self-defense and Hampton lacked credibility.

¶ 25    "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 26    We will not retry the defendant when reviewing a challenge to the sufficiency of the evidence at trial. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so

unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 27    Evans was convicted of domestic battery. To sustain his conviction, the State was required to prove beyond a reasonable doubt that Evans knowingly, without legal justification, by any means, made physical contact of an insulting or provoking nature with any family or household member. 720 ILCS 5/12-3.2(a)(2) (West 2018).

¶ 28    Evans does not dispute that he bit Hampton on the nose and wrist. In fact, both Evans and Hampton testified that he bit both her nose and wrist during their altercation. Rather, Evans claims that his conviction should be reversed because the evidence showed that he was justified in biting Hampton where he was acting in self-defense and she was the initial aggressor.

¶ 29    Section 7-1(a) of the Code (720 ILCS 5/7-1(a) (West 2018)) provides that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). Self-defense includes the following elements:

> "(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *People v. Gray*, 2017 IL 120958, ¶ 50.

A defendant's self-defense claim fails where the State negates any one of these elements. *Id.*

¶ 30    After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that Evans was not acting in self-defense because he was the initial aggressor. Here, the State's evidence showed that Hampton and Evans argued in Evans's apartment. During the argument, Hampton was sitting in a chair putting on her shoes, when Evans initiated a physical altercation by flipping the chair over while she was sitting in it and slapping her face repeatedly. Hampton tried to block Evans's blows and told him she wanted to leave his apartment, but Evans further escalated the struggle by choking her, shaking her, and tossing her around the room, causing her to slip "in and out of consciousness." See *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 65 (the State presented sufficient evidence to negate the defendant's self-defense theory where the defendant was the initial aggressor, as the complainant did not strike the defendant until after the defendant injured the complainant); *People v. Guja*, 2016 IL App (1st) 140046, ¶ 55 (finding the trial evidence did not support a theory of self-defense, where the defendant caused the complainant to lose consciousness, the complainant regained consciousness and "abandoned the quarrel," and the defendant "continued to attack her").

¶ 31    When Hampton attempted to defend herself with mace, Evans retrieved a pocketknife and the two struggled over the knife. During the struggle, Evans bit Hampton's wrist and nose and only let go of the knife after cutting himself. The State entered into evidence photographs of the marks Hampton sustained from Evans biting her. This evidence, and reasonable inferences therefrom, was sufficient for the trier of fact to find that Evans, and not Hampton, was the initial aggressor. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the

defendant."). As mentioned, a reviewing court will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Bradford*, 2016 IL 118674, ¶ 12. This is not one of those cases.

¶ 32 Evans nevertheless disputes the trial court's determinations of credibility, asserting that Hampton was not credible, and that his account established that he acted in self-defense. According to Evans, he "immediately" called the police and gave his account, suggesting that he was the victim, while Hampton omitted several key details of the incident when reporting the offense to the dispatcher and did not relay the details until she testified at trial. However, the fact that Evans "immediately" called the police does not show that Hampton was the aggressor, where the evidence also showed that Hampton and Evans called the police at approximately the same time. Further, Hampton's failure to report every detail of the incident immediately after it occurred, at a time when she testified she was afraid, did not necessarily affect her credibility. See *Gray*, 2017 IL 120958, ¶ 48 (rejecting the defendant's claim that the complainant's "walking past police officers without requesting help" immediately after the altercation "rendered [the complainant's] entire story 'utterly implausible,' " where the trier of fact could have reasonably accepted the complainant's explanation of said conduct).

¶ 33 Additionally, Evans questions Hampton's credibility on the basis that she had a motive to lie, where she believed Evans was cheating on her and attempting to break up with her. Evans further claims that Hampton's account was questionable because it "strains credulity" that she remained in the apartment given his behavior.

¶ 34 In finding Evans guilty, the court expressly found that Hampton's account, and not Evans's, was credible. Specifically, the court reasoned that Hampton was "consistent" and

"described an event where Mr. Evans got upset and *** attack[ed] her." On the other hand, the court did not find Evans credible, as it did not believe that he "just walk[ed] away" from the altercation to smoke a cigarette. The court also noted that had Hampton been the aggressor, she would have sprayed Evans with the mace, and not the wall. While Evans asserts that he threw the knife across the room to hide it from Hampton, the court was not "required to accept the defendant's version of the facts." See *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 53. This court will not retry a defendant and overturn the trial court's credibility determinations on appeal simply because a defendant claims a witness was incredible. *Lee*, 213 Ill. 2d at 225 (in deciding a self-defense claim, it is the function of the trier of fact to assess the credibility of the witnesses and resolve conflicts or inconsistencies in the evidence). In sum, we find the evidence at trial was sufficient to sustain Evans's conviction for domestic battery.

¶ 35   For the foregoing reasons, we affirm the judgment of the trial court.

¶ 36   Affirmed.