NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180691-U

NO. 4-18-0691

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 23, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DAVID SEARS, | ) | No. 17DT575 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) It was no abuse of discretion to find a lack of evidence to support the giving of
jury instructions on necessity and involuntary intoxication.

(2) The asserted violation of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012)
is procedurally forfeited, and in the absence of a clear or obvious violation of that
rule, the doctrine of plain error does not avert the forfeiture.

¶ 2    In the circuit court of McLean County, a jury found defendant, David Sears, guilty

of driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2016)). The court

sentenced him to 60 days in jail followed by 24 months of conditional discharge. He appeals on

two grounds.

¶ 3    First, Sears maintains that the circuit court erred by refusing to instruct the jury on

necessity and involuntary intoxication. The court decided that there was no evidence to support

the giving of jury instructions on those affirmative defenses. We find no abuse of discretion in that decision.

¶ 4    Second, Sears contends that the circuit court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by the way the court questioned the potential jurors regarding the constitutional principles in that rule. This issue is procedurally forfeited, and because we find no clear or obvious violation of Rule 431(b), the doctrine of plain error is inapplicable, and the forfeiture will be honored.

¶ 5    Therefore, we affirm the judgment.

¶ 6                                I. BACKGROUND

¶ 7                         A. The Circuit Court's Examination of

                         the Prospective Jurors on the *Zehr* Principles

¶ 8    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) contains a list of four constitutional principles, called the "*Zehr* principles," after *People v. Zehr*, 103 Ill. 2d 472 (1984), which the circuit court must ensure that the prospective jurors "understand and accept" (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)). In this case, the court recited to the prospective jurors all four *Zehr* principles at once and then asked the prospective jurors if they understood and accepted the principles:

> "I'm going to read to you a series of four legal principles[,] and then I'm going to come to each of you individually and ask whether you understand and accept each of these four legal principles.
>
> The first of the four is that the defendant is presumed innocent of the charges against him; second, that[,] before a defendant can be convicted, the [S]tate must prove the defendant guilty beyond a reasonable doubt; third, that the defendant is

- 2 -

not required to offer any evidence on his own behalf; and, fourth, that the defendant's failure to testify cannot be held against him.

Do each of you understand and accept each of these four legal principles?" The court then began prompting each prospective juror, who answered in the affirmative. For example:

"Mr. Mcrann?

PROSPECTIVE JUROR: Yes.

THE COURT: Mr. Neuhaus?

PROSPECTIVE JUROR: Yes.

THE COURT: Ms. Strait?

PROSPECTIVE JUROR: Yes."

¶ 9                                    B. The State's Case-in-Chief

¶ 10        Ronald Stoll, a police officer for the town of Normal, Illinois, testified that on October 6, 2017, at about 12:48 a.m., the police were requested to check on a man who was sitting next to a truck at a Casey's gas station. Upon arriving at the gas station, Stoll and his partner saw Sears sitting on the ground, next to a pickup truck, the engine of which was still running. Sears appeared to be semiconscious. Initially, he was unresponsive. His eyelids were fluttering and were closed most of the time. He kept nodding as if he were about to fall asleep. When Stoll asked Sears for identification, it took a while for Sears to get the identification out of his pocket. His movements were slow and clumsy. His speech was slurred. He mumbled.

¶ 11        Stoll testified: "[Sears] admitted several times that he knew he shouldn't have been driving, that he knew he was too drunk to drive, and that's why he stopped at the Casey's." Sears further explained to Stoll and his partner that he had come from Bistro Bar in Bloomington, Illinois,

where he had consumed only two drinks. However, Sears added, he did not "handle [his] alcohol well."

¶ 12        Having conducted approximately 300 DUI stops, Stoll was skeptical that Sears had consumed only two drinks. Stoll administered to him several field sobriety tests, which were recorded by the dashcam of the squad car. The circuit court admitted the video footage in evidence. In the horizontal gaze nystagmus test, Sears exhibited all six signs of impairment. In the walk and turn test, he exhibited six of the eight signs of impairment. Stoll had no opportunity to observe the other two signs in the walk and turn test because Sears was unable to complete the test. Twice, Stoll requested Sears to recite the alphabet, and both times Sears ended with " [']Y, M, Z['] " as the terminal letters of the alphabet.

¶ 13        At the conclusion of the field sobriety tests, Stoll asked Sears if he had anything on his person. Sears reached into his pocket and pulled out a marijuana pipe. In Sears's right pocket, Stoll found a small container of what he recognized to be marijuana.

¶ 14        At 1:58 a.m. on October 6, 2017, Stoll administered to Sears a breath test. The result was 0.104. In Stoll's opinion, this blood-alcohol concentration was too low to account for Sears's apparent level of intoxication. It seemed to Stoll, therefore, that Sears was intoxicated with more than alcohol.

¶ 15        Nevertheless, Stoll concluded that Sears had committed the offense of driving under the influence of alcohol. He arrested Sears for that offense.

¶ 16        In an ensuing inventory search of Sears's pickup truck, the police found, on the front passenger seat, a prescription bottle for clonazepam. According to its label, the bottle had been refilled with 60 pills on October 2, 2017. Yet, the police could find only three pills, and instead of being in the bottle, the three pills were on the seat, next to the bottle.

¶ 17 At some point, another man arrived at the gas station. Stoll believed that this man was Sears's friend and that, sometime before the police arrived, Sears had telephoned him to come and pick him up.

¶ 18 While sitting in the back seat of the squad car, Sears warned the police officers that he needed to vomit. He was let out of the squad car, and he vomited on the ground.

¶ 19 Stoll called an ambulance to take Sears to the hospital. In the hospital, Sears passed out on the bed. Upon awaking, he had mood swings. At first, he spoke calmly with the nurses, and then he became irate, screaming for a blanket. Eventually, he calmed down again.

¶ 20 At 2:28 a.m. on October 6, 2017, half an hour after the breath test, an emergency room technician collected blood and urine samples from Sears. Alexandra Baluka, a forensic scientist, testified that on February 14, 2018, she analyzed the blood sample and found a blood alcohol concentration of 0.124. This was somewhat higher than the result of the breath test. The reason, Baluka explained, was that alcohol did not enter the bloodstream immediately. The rate at which the body absorbed alcohol depended on many factors, including the person's weight and what the person had eaten.

¶ 21 Months after Baluka tested the blood sample, the laboratory received a request to perform a comprehensive analysis of Sears's urine sample. Accordingly, Baluka performed a full-panel analysis of Sears's urine, including tests for gamma hydroxybutyrate and Rohypnol, commonly known as "date rape drugs." She testified that it was possible to use other substances, such as barbiturates or benzodiazepines, to drug people against their will. For example, clonazepam was a benzodiazepine. Sears's urine sample tested negative, however, for clonazepam. But it tested positive for amphetamine, methamphetamine, cocaine metabolite, and tetrahydrocannabinol.

¶ 22                                    C. Sears's Case-in-Chief

¶ 23          Sears took the stand on his own behalf. He testified that, although he did not have

any money the night of October 5, 2017, he decided to go to karaoke night at Bistro Bar anyway.

He drove there in his mother's pickup truck and parked about a block away.

¶ 24          In Bistro Bar, he met a couple who bought him a shot and a drink. He chose a vodka

cranberry, which was what he usually drank. He downed the shot and sipped his drink until it was

his turn to sing. When he went to the stage to sing, he left his drink with the couple. Afterward, he

returned to the table to continue talking with the couple and drinking his drink.

¶ 25          Eventually, Sears got the urge to smoke some marijuana that he had brought with

him. He thought it would be only right to share it with the couple. The woman declined, but the

man accepted. To be discreet about smoking the marijuana, Sears and the man went into the unisex

bathroom at the back of the bar. Sears loaded a hit into his pipe, enough for two or three drags, and

handed the pipe to the man. After the man finished smoking, Sears refilled the pipe for himself.

While Sears was taking a hit from the pipe, the man drew uncomfortably close to him. The man

caressed Sears's neck, slid his hand down the back of Sears's shirt, and caressed the crotch area of

Sears's pants.

¶ 26          By then, Sears had begun to feel "like a haze that moves in and then you start to

lose motor function." This was not the first time that Sears had consumed alcohol and marijuana

in combination, and he could tell that he was under the influence of more than alcohol and

marijuana. He had never felt that way before.

¶ 27          Defense counsel asked Sears when he had last felt that way (that is, the last time

before that night). The State objected. Outside the jury's presence, the parties and the circuit court

discussed the State's objection. Defense counsel explained to the court that, prior to the night in

question, there was an occasion when Sears was drugged and sexually assaulted and that this prior experience, which had happened under similar circumstances, tended to show the reasonableness of Sears's decision to get into the truck and to drive away. In the light of his previous experience, Sears had a strong foreboding of what was about to happen to him, and he acted accordingly—and reasonably, defense counsel argued. The State maintained, on the other hand, that the prior alleged sexual assault was irrelevant. The circuit court sustained the State's objection.

¶ 28        Defense counsel resumed his direct examination. Sears testified that, when he was in the bathroom being groped, a feeling of haziness descended upon him and he felt as if he were beginning to lose his balance. The man slid his hand into Sears's pants, and Sears grabbed the man's hand and punched him, knocking him down. He then pushed the man to the other side of the small bathroom and exited the bathroom. From the bathroom, which was at the back of the bar, Sears walked the length of the bar, which was crowded with patrons. He left Bistro Bar through the main entrance and walked to the truck. He felt "[s]cared, very vulnerable, kind of powerless." He was uncertain that he would be able to stand much longer. He was losing his motor functions and was becoming disoriented. He described the feeling as follows: "I know where I am because I know my surroundings, but there's a sense of being lost in a familiar place." His sense of right and wrong, however, remained intact. He knew it was not right to be stuck in a place where he felt unsafe. He remembered getting into the pickup truck and driving away, but he did not remember much else. He did not remember arriving at the gas station or how much time had passed before the police arrived. His sense of time was skewed. He could remember only parts of his interaction with the police officers. He did not remember calling his boyfriend, who showed up after the police. Sears inferred, however, that he must have called his boyfriend sometime between leaving Bistro Bar and arriving at the gas station.

- 7 -

¶ 29　　　　　　After Sears's testimony, defense counsel sought to recall Baluka to testify about the possible effects of the drugs that had been found in Sears's system. Though refusing to allow defense counsel to recall Baluka for that purpose, the circuit court allowed defense counsel to make an offer of proof, beginning with Baluka's qualifications to opine on that subject. Baluka was questioned regarding her qualifications. Over the State's objection, the court accepted Baluka as an expert in pharmacology, the study of various classes of drugs and their effects. Defense counsel then asked Baluka:

> "Is it possible to use amphetamine, generally an upper, to incapacitate someone?
>
> A. I—due to my experience, I haven't seen it, but I don't—I can't say for sure that it can't be used as one or it could be used as one."

The court sustained the State's objection to Baluka's testimony in the offer of proof, finding the testimony to be "far too speculative, inconclusive, and [of] no relevance to the case."

¶ 30　　　　　　The circuit court, however, allowed defense counsel to recall Sears. He testified that, on October 6, 2017, he did not tell the police officers about the sexual assault. His reasons for not telling the police at that time were partly because he felt ashamed and partly because he wanted to ignore what had happened to him. Eventually, though, he went to the Bloomington Police Department and reported the assault. He urged the police to investigate whether he had been drugged in connection with the sexual assault: whether narcotics other than alcohol and cannabis could be found in his system. Thus, it was Sears who had requested the further chemical analysis. As a result of that request—which the police granted—he ended up facing an additional charge in this case. Whereas, originally, he was charged only with two counts of

driving under the influence of alcohol, the State now added a third count: driving while having controlled substances in his system.

¶ 31      Sears testified that he had never used amphetamines or methamphetamines and that on October 5 and 6, 2016, he did not intentionally ingest cocaine.

¶ 32                          D. The State's Case in Rebuttal

¶ 33      Erik Yamada, a Bloomington police officer, testified that on October 10, 2017, Sears came to the Bloomington police station and reported that he had been "touched inappropriately" in Bistro Bar. According to the statement that Sears made that day, he had met a white blonde woman and a white dark-haired man, whose names he did not know, and they had bought him a shot and a drink. He believed that something might have been put in his drink. After the sexual assault, Sears had become scared, had left the bar, and had driven his truck to Normal. As Yamada recalled, Sears was nervous and upset while making this report, and he may have started to cry. Yamada talked to Sears about following up on the reported conduct and finding out who the couple was. Sears, however, was unwilling to take any further action. He told Yamada that "he was embarrassed and just wanted to be able to go."

¶ 34                          E. The Verdicts and the Sentence

¶ 35      The jury found Sears guilty of driving under the influence of alcohol, not guilty of driving while having a blood-alcohol concentration of 0.08 or more, and not guilty of driving while having a controlled substance in his blood or urine.

¶ 36      The circuit court sentenced Sears to confinement in jail for 60 days, to be followed by 24 months of conditional discharge.

¶ 37                          II. ANALYSIS

¶ 38      A. The Dispute Over Which Standard of Review Applies to

the Circuit Court's Refusal to Instruct the Jury on the

Affirmative Defense of Necessity and Involuntary Intoxication

¶ 39 Sears contends that the circuit court erred by refusing to instruct the jury on the affirmative defenses of necessity (see 720 ILCS 5/7-13 (West 2016)) and involuntary intoxication (see *id.* § 6-3).

¶ 40 The parties disagree on the standard of review applicable to this issue. On the authority of *People v. Washington*, 2012 IL 110283, ¶ 19; *People v. Chapman*, 194 Ill. 2d 186, 217 (2000); and *People v. Jones*, 175 Ill. 2d 126, 132 (1997), Sears maintains that the standard of review is *de novo* (and, alternatively, even if the standard of review is deferential, he argues that we nevertheless should find reversible error in the circuit court's refusal to instruct the jury on these affirmative defenses). The passage from *Jones* on which Sears relies reads as follows: "In essence, unless the evidence before the trial court is so clear and convincing as to permit the court to find *as a matter of law* that there is no affirmative defense, the issue of whether a defendant should be relieved of criminal liability by reason of his affirmative defense must be determined by the jury with proper instruction as to the applicable law." (Emphasis added.) *Jones*, 175 Ill. 2d at 132. Focusing on the phrase "as a matter of law" (*id.*), Sears cites *Chapman* for the proposition that questions of law are decided *de novo*. See *Chapman*, 194 Ill. 2d at 217.

¶ 41 In the passage that Sears quotes from *Jones*, however, the supreme court did not specifically say that the standard of review was *de novo*. See *Jones*, 175 Ill. 2d at 132. In fact, elsewhere in *Jones*, the supreme court gestured toward a deferential standard of review: "A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to

- 10 -

so instruct the jury." *Id.* at 131-32. This was as good as saying that the reviewing court should look for an abuse of discretion.

¶ 42       Granted, in *Washington*, the supreme court plainly stated: "The question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review." *Washington*, 2012 IL 110283, ¶ 19. As the State observes, however, the supreme court has retreated from that statement in *Washington*. In the subsequent case of *People v. McDonald*, 2016 IL 118882, ¶ 42, the supreme court held: "[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion."

¶ 43       This is the most deferential standard of review recognized by the law. *People v. Coleman*, 183 Ill. 2d 366, 387 (1998). "A trial court abuses its discretion only when its ruling is arbitrary, fanciful[,] or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 401 (2004). Thus, by refusing to instruct the jury on necessity and involuntary intoxication, the circuit court abused its discretion only if no one could reasonably dispute the existence of some evidence, very slight evidence, supporting each element of those affirmative defenses. See *id.*; *Jones*, 175 Ill. 2d at 132 (holding that "[v]ery slight evidence upon a given theory of a case will justify the giving of an instruction").

¶ 44                    B. The Affirmative Defense of Necessity

¶ 45       Section 7-13 of the Criminal Code of 2012 defines the defense of necessity as follows:

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the

situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2016).

It follows, then, that the affirmative defense of necessity has two elements: (1) the defendant "was without blame in occasioning or developing the situation" and (2) the defendant "reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." *Id.*; *People v. Janik*, 127 Ill. 2d 390, 399 (1989).

¶ 46        Sears maintains that the first element had "some foundation" in the evidence. *Jones*, 175 Ill. 2d at 131-32. Although he knowingly and willingly consumed alcohol and marijuana, additional drugs were found in his system: amphetamine, methamphetamine, and a cocaine metabolite—and, in his testimony, he denied knowingly consuming those other drugs. If his testimony were believed, the only apparent way those other narcotics could have entered his body was if, while he was away from the table, singing his karaoke song, the couple spiked his drink. Sears testified that, having drunk alcohol and having smoked marijuana on previous occasions, he could tell that, in the bar that night, he was under the influence of more than alcohol and marijuana. Indeed, he was, as chemical testing confirmed. By merely drinking alcohol and smoking marijuana, he did not sign up for the extreme level of intoxication he experienced, any more than he signed up for being sexually assaulted. Sears's own testimony was, he contends, some evidence that he was "blameless in creating the dangerous situation he was trying to escape," namely, being preyed on sexually while he was severely impaired—a condition of impairment that was worsening by the moment, making it all the more urgent that he put plenty of distance between himself and his assailant.

¶ 47        This urgent need to escape fulfills the second element, in Sears's view: "the accused *** reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his or her own conduct." 720 ILCS 5/7-13 (West 2016). According to Sears, there is some evidence, in the form of his own testimony, "that *he believed* it was necessary for him to drive his truck away from Bloomington to avoid a possibly escalating sexual assault." (Emphasis added.) It is worth noting, here, that Sears omits the adverb "reasonably," which, in the statute, modifies the verb "believed." See *id.* The omission is by design. Sears maintains, on the authority of *People v. Lockett*, 82 Ill. 2d 546, 552-53 (1980), that evidence of his subjective belief is enough to satisfy the second element in section 7-13 (720 ILCS 5/7-13 (West 2016)) and that the reasonableness of his belief should be left for the jury to decide.

¶ 48        The State, on the other hand, sees no evidence of either element of necessity. In the State's view, Sears cannot be fairly characterized as blameless "in occasioning or developing the situation in which he drove under the influence." See *id.* By his own admission, he voluntarily drank alcohol and smoked marijuana before driving. The second element, the State argues, "is even easier to dispose of." It is evident, from Sears's own testimony, that he "had multiple opportunities to seek help or protection without knowingly driving under the influence." After knocking down his assailant in the bathroom, Sears exited the bathroom and walked through a crowded bar. There was no evidence that his assailant was still pursuing him. Even if the assailant was biding his time, waiting for Sears to sink into an alcoholic or narcotic stupor, there was no evidence that Sears told the bartender or any of the numerous patrons, "I was sexually assaulted in the bathroom. I believe I've been drugged. I need help. Please call the police." Instead, Sears chose to drive while under the influence of alcohol—which should have been the last resort, not the first resort. Under the second element, the State argues, the illegal conduct of DUI was justifiable only

if (1) other options were unavailable (see *People v. Cord*, 258 Ill. App. 3d 188, 193 (1994)) and (2) the threat of harm continued to be immediate (see *People v. Guja*, 2016 IL App (1st) 140046, ¶ 47)—and, in the trial, neither of those conditions of objective reasonableness was suggested by a sliver of evidence.

¶ 49    The State disagrees with Sears that the question of minimal reasonableness is out of bounds for the circuit court. The State regards that position as flatly inconsistent with case law. In *People v. Cord*, 258 Ill. App. 3d 188, 194 (1994), for example, the appellate court held that "the trial court [had] correctly denied [the] defendant's request for an instruction on the defense of necessity," given the lack of evidence that driving while intoxicated had been the defendant's only alternative. The defendant's subjective belief in the necessity of driving while drunk never was shown, by any evidence, to have been objectively reasonable—and, hence, a jury instruction on necessity would have been unearned. See *id.*

¶ 50    Sears counters that, in *People v. Kucanik*, 367 Ill. App. 3d 176, 180 (2006), the Third District disagreed with the Second District's assumption in *Cord*, 258 Ill. App. 3d at 192, that the illegal conduct had to be the *sole* reasonable alternative. But we do not know how else to understand the supreme court's description of necessity. The supreme court teaches in *Janik*, 127 Ill. 2d at 399: "This defense is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable [citation], and the conduct chosen must promote some higher value than the value of literal compliance with the law." In other words, the defense of necessity assumes that only two options were available to the defendant, both of them bad— (1) violating the criminal statute or (2) not violating the criminal statute—and that the first option was the only reasonable one because the badness of the second option was greater. A jury instruction on necessity is warranted only if there is some evidence that the defendant was in such

- 14 -

a dilemma. There had to be some evidence, enough to raise reasonable doubt (*Cord*, 258 Ill. App. 3d at 192), that breaking the law was the sole reasonable alternative under the circumstances (*Guja*, 2016 IL App (1st) 140046, ¶ 49; *People v. Govan*, 169 Ill. App. 3d 329, 338 (1988)). Otherwise, breaking the law would not have been *necessary* in the true sense of the word.

¶ 51　　　　According to Sears's testimony, he *subjectively* believed that driving while intoxicated was necessary. He contends, on the authority of *Lockett*, that his subjective belief was enough to merit a jury instruction on necessity and that, by requiring some evidence of reasonableness, the circuit court usurped the jury's prerogative. He reasons as follows:

> "In deciding whether to instruct the jury on an affirmative defense, *** the court *cannot* concern itself with the reasonableness of a defendant's actions, as that question is solely for the jury to decide. See *Lockett*, 82 Ill. 2d at 552-53 (holding that jury decides whether a defendant's subjective belief in the need for self-defense was reasonable or not reasonable). Similar to the self-defense context, the court must give a necessity instruction where there is 'some evidence, however slight,' *Washington*, 2012 IL 110283, ¶¶ 43, 51, that the defendant has a subjective belief that his conduct is necessary to avoid another harm. It is then for *the jury* to decide whether that belief was reasonable, such that it should excuse the defendant from criminal liability. The trial court's finding here that [defendant's] belief that he needed to drive to escape the sexual assault was unreasonable because there were 'other reasonable alternatives' available invaded the province of the jury." (Emphases in original.)

¶ 52　　　　Sears's comparison of self-defense and necessity has some validity in that both affirmative defenses, by their terms, require that the defendant had a reasonable belief. *Cf.* 720

- 15 -

ILCS 5/7-1(a) (West 2016) (providing that "[a] person is justified in the use of force against another when and to the extent that he *reasonably believes* that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force" (emphasis added)) and *id.* § 7-13 (including the element that the defendant "*reasonably believed* such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct" (emphasis added)). Even though, according to the plain terms of statutory law, the defendant's belief had to be reasonable, some of the language in *Lockett* could easily be understood as dispensing with a minimal showing of reasonableness as a condition to instructing the jury on self-defense. Some of the language in *Lockett* could easily be interpreted as requiring a jury instruction on self-defense if the defendant testified merely to his or her subjective belief in the need for self-defense. After all, the supreme court held in *Lockett*, 82 Ill. 2d at 553:

> "[A] self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary. If the subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. [Citation.]"
>
> The determination of whether the defendant's subjective belief is reasonable is for the jury to make."

¶ 53       That passage must be understood, however, in the context of the issue the supreme court was asked to decide in *Lockett*: whether, *given* the inclusion of a jury instruction on self-defense, the trial court *also* should have instructed the jury on voluntary manslaughter, now known as second degree murder (*People v. Jeffries*, 164 Ill. 2d 104, 111-12 (1995)). *Lockett*, 82 Ill. 2d at 549. In *Lockett*, the defendant's entitlement to an instruction on self-defense was

- 16 -

undisputed. The dispute was whether, additionally, the court should have instructed the jury on voluntary manslaughter. Having earned a jury instruction on self-defense by a minimal showing of reasonableness, how could the defendant have been expected to turn around and earn an instruction on voluntary manslaughter? Making a minimal threshold showing of *unreasonableness* for a voluntary manslaughter instruction would have been problematic for the defendant. He would have had to contradict himself. It would have been untenable for the defendant to argue the unreasonableness of his use of force for the purpose of voluntary manslaughter while arguing the reasonableness of his use of force for the purpose of self-defense. The supreme court saved the defendant from this predicament by holding that the defendant's subjective belief in the need for self-defense was enough to merit a jury instruction on voluntary manslaughter—to accompany the already-earned and uncontroversial jury instruction on self-defense. The supreme court held in *Lockett*: "[*W*]*hen the evidence supports submitting an instruction on justifiable use of force*, a tendered [instruction] on voluntary manslaughter also should be given." (Emphasis added.) *Id.* at 553.

¶ 54        In the subsequent case of *Jeffries*, 164 Ill. 2d at 127-28, the supreme court made clear that "the evidence support[ing] submitting an instruction on the justifiable use of force" (*Lockett*, 82 Ill. 2d at 553) must include the reasonableness of the defendant's belief. The supreme court taught in *Jeffries*, 164 Ill. 2d at 127-28:

> "*In order to instruct the jury on self-defense, the defendant must establish some evidence of each of the following elements*: (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a

danger existed which required the use of the force applied; and (6) *his beliefs were objectively reasonable*." (Emphases added.)

Thus, for a trial court to instruct the jury on self-defense or necessity, there must be some evidence of the defendant's subjective belief as well as some evidence of the objective reasonableness of that belief. Those twin components of subjectivity and objectivity are inherent in the concept of *reasonable belief*, which is written into the second element of necessity (720 ILCS 5/7-13 (West 2016)).

¶ 55    We agree with the State that there was no evidence, not even "[v]ery slight evidence" (*Jones*, 175 Ill. 2d at 132), of the second element of necessity. The State's argument on the first element of necessity strikes us as less convincing (and, to be clear, the circuit court found a lack of evidence on the second element, not the first element). The question under the first element is not whether Sears is to blame for his "conduct." 720 ILCS 5/7-13 (West 2016). (*Of course* he knowingly and voluntarily drank enough alcohol to be under its influence; he does not suggest that his drink was spiked with alcohol.) Rather, the question is whether he is to blame for his "situation." *Id.* Even under our highly deferential standard of review (see *McDonald*, 2016 IL 118882, ¶ 42), we would disagree that, by merely drinking alcohol and smoking marijuana in a public place, Sears deserved part of the blame for being sexually assaulted. See 720 ILCS 5/7-13 (West 2016). Such a holding would be arbitrary. See *Santos*, 211 Ill. 2d at 401.

¶ 56    In finding, however, no evidence of a lack of reasonable alternatives to driving under the influence of alcohol, the circuit court was within its discretion. We see no evidence that the assailant persisted in his sexual advances after Sears physically repulsed him. Even if one accepted, as an immediate threat, the possibility that the assailant might have carried Sears out of the bar after Sears eventually sank into narcotic lethargy, we see no evidence that Sears sought

- 18 -

help from any of the people who surrounded him in the crowded bar. We see no evidence that driving while intoxicated, thereby endangering others, was his sole reasonable alternative. We conclude, then, that the refusal of the jury instruction on necessity was not an abuse of discretion. See *McDonald*, 2016 IL 118882, ¶ 42.

¶ 57                 C. The Affirmative Defense of Involuntary Intoxication

¶ 58       Sears maintains that the circuit court likewise erred by refusing to instruct the jury on the affirmative defense of involuntary intoxication. Section 6-3 of the Criminal Code of 2012 defines that affirmative defense as follows: "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2016). Thus, the affirmative defense of involuntary intoxication has two elements: (1) the intoxicated or drugged condition was involuntarily produced and (2) the intoxicated or drugged condition deprived the defendant of substantial capacity either (a) to appreciate the criminality of his or her conduct or (b) to conform his or her conduct to the requirements of law. *Id.*

¶ 59       Sears contends that there was some evidence of the first element. He testified that, although his consumption of alcohol and marijuana had been voluntary, he had not knowingly and voluntarily consumed the amphetamine, methamphetamine, and cocaine that were found his system. In Bistro Bar, while Sears was away from his alcoholic beverage, singing his karaoke song, the couple had the opportunity to spike his drink. In Stoll's view, there was "no way" that Sears's condition of extreme intoxication was owing to the relatively "low" blood-alcohol reading of 0.104 yielded by the breath test. All of this was, in Sears's view, some evidence of the first element: that the intoxicated or drugged condition had been involuntarily produced. See *id.*

¶ 60      Also, Sears argues, there was some evidence of the second element of involuntary intoxication: that, because of his involuntary intoxication, he lacked the "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *Id.* In the bathroom of Bistro Bar, Sears felt "a haze" and a looseness in his limbs. He had begun to lose his sense of balance. His motor functions were fading. Although he knew where he was, he had an uncanny "sense of being lost in a familiar place."

¶ 61      But none of those symptoms was a loss of the ability to recognize and to refrain from illegal conduct. Instead, Sears was lethargic. He appeared to be in what is commonly known as an alcoholic stupor. Drowsiness is not a loss of the moral faculty. Wanting to fall asleep is not the same as losing the ability to distinguish between right and wrong and to act accordingly.

¶ 62      Besides, it is not commonly known that amphetamine, methamphetamine, or cocaine causes lethargy or a stupor. Nor was any evidence presented that those drugs had such an effect. Although there was some evidence, in the form of Sears's testimony, that his consumption of amphetamine, methamphetamine, and cocaine had been involuntary, there appears to be no evidence that he was *intoxicated* by amphetamine, methamphetamine, or cocaine. To "intoxicate" means "to excite or stupefy by alcohol or a drug[,] especially to the point where physical and mental control is markedly diminished." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/intoxicate (last visited November 25, 2020). Alcohol is widely known to be a depressant. By contrast, amphetamine, methamphetamine, and cocaine are widely known to be stimulants. That is why defense counsel referred to amphetamine (and, therefore, methamphetamine) as an "upper." That is why amphetamine and methamphetamine are otherwise known as "speed." See Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/speed (last visited Nov. 30, 2020). At the gas

station, Sears did not act as if he were in a condition of stimulation. We see plenty of evidence, though, that he was intoxicated by a depressive drug, alcohol. He was sitting on the ground, nodding off. His eyelids were fluttering. His movements were slow and uncoordinated. He was slurring his words and was mumbling. Those physical symptoms are commonly known to be signs of alcohol intoxication—but they are not commonly known to be signs of having taken speed or cocaine. We see no evidence that Sears was intoxicated by a physically stimulating drug such as amphetamine, methamphetamine, or cocaine, although those drugs were found in his system. It appears that he was *intoxicated* only by what he had *voluntarily* consumed: alcohol. He remarked to Stoll that he did not hold his alcohol well.

¶ 63 Even if Sears were intoxicated also by amphetamine, methamphetamine, and cocaine, we see no evidence that the intoxication "deprive[d] him of substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2016). Feeling "hazy," loose in the limbs, and unsteady on one's feet does not mean losing the ability either to distinguish right from wrong or to conform to the law. In the trial, the prosecutor asked Sears:

"Q. What about your sense of morality, was that

altered at all?

A. Meaning what exactly?

Q. Your sense of right and wrong.

A. I don't think so. I knew it wasn't right for me to be stuck in a place where

I didn't feel safe."

Also, by his own admission to Stoll, Sears demonstrated an ability to act on his knowledge of the difference between right and wrong. He told Stoll: " 'I knew I was too intoxicated to drive. That's

why I stopped.' " Therefore, not only does the record lack any evidence of the second element of involuntary intoxication, but the record contains evidence affirmatively disproving that element. We are unable to say, then, that the circuit court abused its discretion by refusing to instruct the jury on the affirmative defense of involuntary intoxication. See *McDonald*, 2016 IL 118882, ¶ 42.

¶ 64                          D. The Admonitions and Inquiries Under Rule 431(b)

¶ 65        Sears contends that the circuit court erred by "collapsing all four Rule 431(b) principles into one question" instead of reciting a *Zehr* principle, asking the potential jurors if they understood and accepted the principle, and then repeating that procedure for each of the remaining three *Zehr* principles. "Collapsing these four fundamental principles of law into one statement is precisely the sort of practice Rule 431(b) aimed to preclude," Sears argues. He "recognizes that [we] recently rejected a similar argument in [*People v.*] *Kinnerson*, 2020 IL App (4th) 170650, ¶¶ 57-65." Nevertheless, he notes, "on March 25, 2020, the Illinois Supreme Court granted a petition for leave to appeal on this very issue in *People v. Birge*, 2019 IL App (4th) 170341-U." Consequently, in Sears's view, his "argument is not yet foreclosed."

¶ 66        Sears's argument is indeed foreclosed unless we find plain error, for he never made a contemporaneous objection to the circuit court's method of admonishing the potential jurors, nor did he raise the issue in a posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48. Sears contends that the evidence was closely balanced and that we, therefore, should disregard the procedural forfeiture. See *id.*

¶ 67        Before reaching Sears's argument that the evidence was closely balanced, we must decide whether there was a clear or obvious error. See *id.* ¶ 49. Since, by Sears's own admission we "recently rejected a similar argument in *Kinnerson*," there was no clear or obvious error. The granting of a petition for leave to appeal in *Birge* does not weaken the precedential authority of

*Kinnerson*. "[T]he precedential effect of an appellate court opinion is not weakened by the fact that a petition for leave to appeal has been granted and is pending \*\*\*." *People v. Harris*, 123 Ill. 2d 113, 129 (1988). In the absence of an error that is clear or obvious, the forfeiture of the Rule 431(b) issue will be honored. See *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 68                                   III. CONCLUSION

¶ 69            For the foregoing reasons, we affirm the trial court's judgment.

¶ 70            Affirmed.