2025 IL App (1st) 231145-U

No. 1-23-1145

Order filed May 5, 2025

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 4996 |
| | ) | |
| KEANYANDAARWA SCOTT, | ) | Honorable |
| | ) | Michael Joseph Kane, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction over his contentions of ineffective assistance of counsel in omitting a jury instruction addressing the duty to retreat and plain error in the trial court's failure to strictly comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 2    Following a jury trial, defendant Keanyandaarwa Scott was found guilty of aggravated discharge of a firearm and sentenced to 54 months in prison.[1] On appeal, he argues that omitting a jury instruction that a noninitial aggressor has no duty to retreat amounted to plain error and, alternatively, that trial counsel provided ineffective assistance by not requesting the instruction. He also asserts that the trial court failed to properly question the potential jurors to ensure they understood and accepted the four fundamental legal principles outlined in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged by information with aggravated discharge of a firearm at a vehicle he knew or should have known to be occupied (720 ILCS 5/24-1.2(a)(2) (West 2014)), premised on an incident in Chicago on February 18, 2015.

¶ 5    Prior to trial, the trial court told the prospective jurors it was "essential *** that each of you understand and embrace certain fundamental principles." The court then explained that (1) all persons charged are presumed innocent; (2) the State bore the burden of proving defendant guilty beyond a reasonable doubt; (3) defendant does not have to present any evidence at all and may rely on the presumption of innocence; and (4) defendant does not have to testify or call any witnesses on his behalf and, if defendant does not testify, "that must not be considered by you in any way in arriving at your verdict." The court asked the prospective jurors, "Is there anyone in the courtroom who disagrees with any of those propositions? If so, I need you to raise your hand right now." The court then confirmed that no hands were raised in the courtroom.

---

[1] The record contains multiple different spellings of defendant's first name. We adopt the spelling "Keanyandaarwa," as used in the charging instrument that initiated these proceedings.

¶ 6                              A. Trial - State's Witnesses

¶ 7     At trial, Richard Lee testified that on February 18, 2015, at about 11 p.m., he was the sole occupant of a GMC Yukon Denali with tinted windows, driving in the far-left lane northbound on I-94 around 111th Street. It was snowing at that time. A Chevrolet Cruze merged from the center lane into the left lane in front of him. The only vehicles in the area were his, the Cruze, and an Illinois Department of Transportation (IDOT) truck driving further in front of him.

¶ 8     Lee flashed his high beams because the Cruze was driving at a slower speed, but the Cruze did not move to the side. He then switched to the center lane, drove past the Cruze, returned to the left lane, and continued driving northbound. Lee heard a "loud bang" that sounded like a "shatter," followed by seven to nine more bangs, which he realized were gunshots coming from the passenger's side of his vehicle. Lee swerved, hit the brakes, and let the Cruze get in front of him. He did not have a firearm or any dangerous weapon, and did not make any gestures at or speak with the occupants of the Cruze prior to the shooting.

¶ 9     The Cruze continued northbound, took the 103rd Street exit, and pulled over on the right shoulder. As Lee approached that exit, he called the police. Lee also pulled over, but on the other side of the shoulder. He then reversed to keep a safe distance, because he did not know whether the individual in the Cruze would continue shooting or chase him on foot. He turned on his high beams so the individual could not see him, exited his vehicle, and stood behind it for protection. Police arrived and processed his Yukon.

¶ 10    The State published audio recordings of Lee's phone calls to police, which were entered into evidence. We have listened to the audio recordings, which are included in the record on appeal. In the first recording, Lee states, "Hello, I just got shot at on the highway." The responder asks for

Lee's location. Lee replies, "They're coming up 103rd right now, they just stopped, I'm behind them *** heading north now." The phone call gets cut off. In a separate phone call recording, Lee states, "Somebody was just shooting at me *** where it splits from Stoney Island to 103rd, and they're heading northbound." Lee states, "Right now they just stopped, and I don't know if they're pointing a gun, I just pulled over." Lee also states that the back window of his vehicle was "busted out."

¶ 11    On cross-examination, Lee denied that he screamed at the Cruze or told its occupants they were driving too slowly. He confirmed that his vehicle's high beams were "[r]eally bright," "blue high intensity lights." Lee flashed the high beams to give a "courtesy warning that [he] almost hit the back of them." While Lee waited for the police, no one from the Cruze approached him or shot at him.

¶ 12    IDOT highway maintainer Alexander Mondy testified that on February 18, 2015, just before 11 p.m., he was driving an IDOT truck northbound on I-94, near 111th. He heard three or four gunshots from the left side of his truck. Through his rearview mirror, he saw a person's arm entering back into the passenger's side window of a sedan traveling slightly behind him and side by side with an SUV. He did not see the SUV's occupant bear a weapon. After about four minutes, Mondy drove back around and saw the SUV pulled over and another vehicle up ahead. Mondy approached the SUV's driver to see if he was okay. He testified that he did not see a weapon on the driver and "[d]efinitely" would have remembered had he noticed a firearm.

¶ 13    A Chicago police sergeant testified that he and his partner responded to the scene and found five or six shell casings on the ground in the right-most lane of the interstate and on the shoulder.

¶ 14     Chicago police officer Tom Fennell testified that he responded to a call of shots fired with his partners Officers Scott DiGrazia and Charles Barango.[2] When he arrived at the scene, he saw two vehicles pulled over on the side of the road. Fennell did not find any weapons in the Yukon or on the driver. He searched the immediate area for a weapon, but did not do an in-depth search of the grass or swamp area along the highway.

¶ 15     On cross-examination, Fennell testified that he "pretty thoroughly" searched the "standard places" in the Yukon, *i.e.*, underneath and in between the seats, in the glove compartment, and in areas that would be accessible to a passenger.

¶ 16     DiGrazia testified that when they arrived at the scene, he saw a small, dark Chevrolet parked on the shoulder and defendant standing on the passenger's side near the trunk. Defendant held a firearm in his right hand. DiGrazia told defendant to "drop the weapon," and defendant placed the firearm on the vehicle's trunk and stepped away from it. DiGrazia detained defendant, and Barango recovered the loaded 10-millimeter Glock handgun. DiGrazia performed a pat down of defendant and recovered a holster for a handgun, a holster for two magazines, and three additional magazines. He did not search the grassy area or the concrete on the highway, but was "sure that was searched."

¶ 17     Illinois State Police sergeant Daniel Garcia testified that he processed the two vehicles recovered from the scene. The State entered multiple photographs of both vehicles. Garcia testified regarding the damage to the passenger's side of the Yukon, including multiple bullet holes and a shattered window. Bullet fragments were found in the front passenger door jamb, on the front

_____

[2] DiGrazia indicated that Barango was unavailable to testify because he had since passed away unrelated to this incident.

passenger floorboard, in the frame of the front passenger door, inside the bottom of the rear passenger door, and between the driver's seat and center console. He did not observe any weapons inside the Yukon. One fired projectile was recovered from the interior of the Cruze. The Cruze's dashboard had red blood-like stains, and a defect in the dashboard's center showed the trajectory of a bullet traveling downward from the passenger's side toward the driver's side.

¶ 18    Illinois State Police forensic scientist Jeffery Parise testified as an expert on firearms and firearms identification. He examined the firearm and magazine recovered from defendant, seven shell casings recovered from the scene on I-94, five bullet fragments recovered from the inside of the Yukon, which included four bullet jackets and one bullet core, and the one bullet jacket recovered from the Cruze. Parise opined that the firearm fired all seven cartridge casings. As to the bullet fragments, he opined that two bullet jackets were fired by the firearm, two bullet jackets were inconclusive, and the bullet core was not suitable for comparison. The fired bullet jacket recovered from inside the Cruze returned inconclusive results with no indication that defendant's firearm did not discharge it. Defendant's jacket tested positive for firearm residue.

¶ 19                                B. Trial - Defense Witness

¶ 20    Defendant testified that he had served in the United States Army from 2004 to 2012, was deployed twice to Iraq, was in combat, received multiple decorations, and was qualified to use several firearms. He was honorably discharged in June 2012 and subsequently employed as a private security bodyguard.

¶ 21    On February 18, 2015, defendant was sitting in the front passenger's seat of the Cruze while his then-girlfriend Brooklyn Wilson drove. It was negative eight degrees outside, and the vehicle's windows were up. Defendant carried a 10-millimeter Glock in a holster on his right side.

While they were driving northbound in the middle lane on I-94, near 111th, an SUV approached them from behind at a high rate of speed and turned on its blinding blue high beam lights. The SUV was about five feet away and defendant felt "uncomfortable." As Wilson drove about 55 miles per hour, the SUV switched to the right lane, sped past them, returned to the middle lane, and immediately jammed on its brakes. Wilson swerved into the left lane and passed the SUV, and the SUV aggressively moved into the left lane behind them. Defendant was alarmed but did not intend to use his firearm because the SUV posed no immediate threat. The SUV accelerated and bumped the back of the Cruze, which lunged forward. Wilson swerved into the middle lane. Defendant told her to "just keep driving" but still did not draw his weapon.

¶ 22    Defendant testified that the SUV pulled up to their side in the left lane with the window down. He saw the SUV's driver reach for a weapon and point it at them. Defendant then testified that the SUV's windows were tinted, but he could see into the vehicle. The SUV's driver seemed to be saying something, but defendant could not make it out. Defendant was in fear for his life and "had to engage" because he "had no other choice." "Training kicked in," and defendant stuck his right arm out the window and fired across the vehicle seven times within seconds. He did it to "defect" the SUV's driver and "deter him from further aggressing on us as he started from the beginning." Seeing a weapon "put [defendant] into protection mode." Defendant did not fire across Wilson, as it would endanger her.

¶ 23    Wilson drove in the right lane past the SUV, and the SUV also moved into the right lane and proceeded to chase them. Defendant and Wilson took the 103rd exit and pulled over to "take a position" where they could protect themselves without "further exchang[ing]" gunfire on the highway and endangering anybody else. Defendant told Wilson to get down inside the vehicle.

Wilson's right hand was bleeding. Defendant exited the vehicle and "postured up by the rear of the vehicle." The SUV was stopped about 70 yards away and turned its high beams on again so that defendant could not see the driver.

¶ 24 Defendant called the Chicago police, but they hung up, so he called back and was connected to the Illinois State Police. We have listened to the two audio recordings, which are in the record on appeal. In the first call, defendant told the responder that "a car just ran us over and *** I exchanged—I fired upon a vehicle—and now they're chasing us *** I need police on I-94 right now. I'm standing outside with my weapon on top of the car." The responder asks defendant for clarification, and defendant states, "He ran us off the road and he kept trying to run us off the road. *** He tried to do it again and he jammed on the brakes in front of us, and then he 'tore' up on the side of us and said some threatening stuff." The responder asked if they were still on the expressway, and defendant said, "he's approaching me right now." The responder said she would get him the state police, but the call cuts off.

¶ 25 In the second recording, defendant called again and told the responder he needed assistance because "a guy just tried to run us off the road, he kept road rage running us off the road, he 'tore' up along the car and said some threatening words and he kept trying to ram us off the road *** I think—he reached for something so I reached for my firearm and I exchanged fire first."

¶ 26 Defendant testified that after calling 911, he disarmed his firearm, placed the ammunition inside the vehicle, and placed the firearm on the vehicle's trunk in case the SUV's driver wanted to "do something else" to them. Defendant explained that, if necessary, he could have quickly armed his firearm again. Defendant also explained that he placed the firearm on the trunk to indicate to the police not to fire at him, and that he was "truly compliant" and protecting himself.

He was transported to a police station. Defendant confirmed he told police "[e]verything that [he] testified to."

¶ 27    On cross-examination, defendant testified, "I don't recall [Lee's] weapon firing because visually and from the angle that I was at, I saw the firearm being pointed at us but I can't say that that was so because of the way that I was engaging." He did not hear gunfire other than his own. No bullets or bullet fragments struck the Cruze from Lee's vehicle. Defendant then stated he did not think that the only bullet hole in the Cruze came from his firearm because "the seventh bullet was conclusive."

¶ 28    Defendant did not recall whether he told police that he saw a firearm aimed at him from the SUV, but later testified that he did tell state police he saw a firearm. He "thought" he reported there being a firearm when he called the police. Defendant also did not recall telling them that, after the shooting, Wilson let go of the steering wheel and he grabbed it. He confirmed that he told the police that the SUV bumped into the Cruze. Defendant felt the "jolt" and there were marks on the rear fender.

¶ 29    Defendant confirmed that he learned to take cover during military training, position behind a vehicle for "[s]ome level of protection," and create distance when confronted with a possible threat. He denied that the "phrase run, hide, and fight" was a part of military training. The State asked defendant if he tried to create distance from the SUV when it initially "cut you off and brake checked you." Defendant replied he was not driving, and confirmed he told Wilson to slow down and move to the right and let the SUV pass, which Wilson did. The State asked if, prior to leaning out the window to fire his weapon, defendant grabbed the steering wheel from Wilson. Defendant stated, "Not initially. She didn't release the steering wheel until *** moments later."

¶ 30    The State called in rebuttal Illinois State Police master sergeant Thomas Ashe, who testified that he spoke with defendant in the morning on February 19, 2015. Defendant told Ashe that he and his girlfriend were traveling in the left northbound lane on I-94 when a Yukon cut them off, causing his girlfriend to swerve into the middle lane. Defendant saw the individual driving the Yukon point his hand at him and "believed that it may have been a gun." Defendant "grabbed the steering wheel *** for balance and then discharged several rounds at the [Yukon]."

¶ 31    Defendant told Ashe he was observing the Yukon's driver "through the window, through a silhouette." He did not tell Ashe that the driver pointed a firearm at him. Defendant never told Ashe that the Yukon bumped into the rear of the Cruze, or that it launched the Cruze forward. Ashe observed the Cruze and did not see "any damage" from it being "rear ended" or "side-swiped." Defendant told Ashe at the conclusion of the interview that the driver of the Yukon was "picking on us." Defendant then began to say, "He was picking on the wrong—" but did not finish the statement. On cross-examination, Ashe clarified that defendant told him Lee "may have had a gun."

¶ 32                         C. Jury Instructions and Close of Trial

¶ 33    Outside the presence of the jury, the court discussed jury instructions with the parties. The court confirmed that the jury would receive the instruction on self-defense based on "24-25.06."[3] Neither party requested Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.09X), which states: "A person who has not initially

---

[3] Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.06), is the instruction for "Use of Force in Defense of a Person."

provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor."

¶ 34 During closing arguments, the State argued in relevant part that "instead of just firing a warning shot or pulling over or simply brandishing the weapon and showing Mr. Lee that he had a weapon *** Defendant decided to engage Mr. Lee by *** firing seven rounds *** at the Yukon." The State asserted that defendant "chose to engage Mr. Lee and then stay engaged rather than trying to de-escalate the situation." He "didn't ask his girlfriend to pull over," and she "could have easily pulled over; let the Yukon go." The State argued that the force used in this case was not legally justified.

¶ 35 When reading the instructions to the jury, the court stated that to sustain the aggravated discharge of a firearm charge, the State had to prove the proposition "[t]hat the Defendant was not justified in using the force which he used" (Illinois Pattern Jury Instructions, Criminal, No. 24-25.06(A) (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.06(A))). The court also instructed the jury regarding self-defense pursuant to IPI Criminal 4th No. 24-25.06 as follows:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another."

¶ 36 The jury found defendant guilty of aggravated discharge of a firearm. The court denied defendant's posttrial motion, which asserted multiple challenges to the court's decisions in

admitting or barring evidence, and asserted the State made improper statements in closing arguments that shifted the burden of proof to defendant and "used the Defendant's service in the military and for his country as a ploy for a defense." The court sentenced defendant to 54 months in prison.

¶ 37                                    II. ANALYSIS

¶ 38              A. Failure to Instruct on IPI Criminal 4th No. 24-25.09X

¶ 39    On appeal, defendant first challenges the jury instructions. He contends that the jury should have been additionally instructed with IPI Criminal 4th No. 24-25.09X, which provides that "[a] person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." Defendant contends that, without the instruction, he was denied a fair trial because the jury received incomplete instructions on the applicable law of self-defense where it was given IPI Criminal 4th No. 24-25.06 but not instructed that defendant had the right to defend himself without first attempting to retreat. He contends that the jury did not understand the crucial information that he was not required to ask Wilson to pull over when they were confronted by Lee's firearm pointed at them, or take any other action instead of firing his own firearm, "as the State incorrectly argued to the jury."

¶ 40                                    1. Plain Error

¶ 41    The State points out, and defendant acknowledges, that he failed to preserve this issue for our review as neither party requested the instruction. Illinois Supreme Court Rule 366(b)(2)(i) (eff. Feb. 1, 1994) provides that in a jury case, "[n]o party may raise on appeal the failure to give an instruction unless the party shall have tendered it." However, defendant asserts his forfeiture may be excused pursuant to Illinois Supreme Court Rule 451(c) (eff. April 8, 2013) and the plain error

rule under Illinois Supreme Cout Rule 615(a) (eff. Jan 1, 1967). In the alternative, he asserts the issue may be reviewed as a matter of ineffective assistance of counsel for failing to tender the instruction on the lack of a duty to retreat.

¶ 42    Rule 451(c) provides that "substantial defects" in criminal jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. April 8, 2013). The rule creates a limited exception "to correct grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed." (Internal quotations marks omitted.) *People v. Radford*, 2020 IL 123975, ¶ 46. Rule 451(c) is coextensive with the "plain error" clause set forth in Rule 615(a) and both rules are construed identically. *Radford*, 2020 IL 123975, ¶ 46. Under the plain-error doctrine, a reviewing court may consider forfeited errors when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 43    However, we need not consider defendant's contention that "it was plain error" not to instruct the jury with IPI Criminal 4th No. 24-25.09X. Although the State characterizes defendant's jury instruction claim as arguing that the trial court erred in failing to *sua sponte* instruct the jury with IPI Criminal 4th No. 24-25.09X, defendant makes no such argument. He generically argues that omission of the instruction was plain error and a substantial defect not subject to forfeiture. But he never argues who made the error, let alone that the court should have given the instruction *sua sponte*. This may perhaps be inferred, but we will not consider an

argument defendant does not make. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in appellant's brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). We therefore limit our consideration to defendant's contention that trial counsel provided ineffective assistance by failing to request IPI Criminal 4th No. 24-25.09X.

¶ 44       2. Ineffective Assistance of Counsel for Failure to Request Jury Instruction

¶ 45     Every criminal defendant has a constitutional right to effective representation of counsel. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Ineffective assistance of counsel claims are governed by the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*)). Under the *Strickland* test, a defendant must establish that: (1) his counsel's performance was deficient, *i.e.*, that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) he was prejudiced by counsel's performance, *i.e.*, that but for counsel's deficient performance, there is a reasonable probability that the result of defendant's proceeding would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36. Failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 46     Counsel's choice of jury instructions is usually a matter of trial strategy, and thus enjoys a strong presumption that they reflect sound trial strategy and are, therefore, generally immune from ineffective assistance of counsel claims. *People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005). Only when an instruction is so critical to the defense that its omission denied the accused the right to a fair trial will counsel be found ineffective for failing to request the instruction. *Id*. We do not find

IPI Criminal 4th No. 24-25.09X so critical to the defense that counsel's failure to request the instruction prejudiced defendant.

¶ 47    Here, defendant was found guilty of aggravated discharge of a firearm. Section 24-1.2(a)(2) of the Criminal Code of 2012 (720 ILCS 5/24-1.2(a)(2) (West 2014)) provides in relevant part that a person commits aggravated discharge of a firearm when he or she knowingly or intentionally "[d]ischarges a firearm *** in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." Defendant did not dispute the State's evidence as to those elements at trial. Rather, defendant asserted that he discharged the firearm at an occupied vehicle out of self-defense, when he saw the vehicle's occupant point a firearm in his direction.

¶ 48    Where a defendant raises self-defense as an affirmative defense, the State bears the burden of not only proving the elements of the charged offense but disproving self-defense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 50. The elements of self-defense are (1) "unlawful force threatened against a person"; (2) "the person threatened was not the aggressor"; (3) "the danger of harm was imminent"; (4) "the use of force was necessary"; (5) "the person threatened actually and subjectively believed a danger existed that required the use of the force applied"; and (6) "the beliefs of the person threatened were objectively reasonable." *Id.* The defendant's claim of self-defense must fail if the State negates any one of these elements. *Id.*

¶ 49    Significantly, "[t]he right of self-defense does not permit one to pursue and inflict injury upon even an initial aggressor." *People v. Guja*, 2016 IL App (1st) 140046, ¶ 54. "If one responds to a confrontation with such excessive force that one is no longer acting in self-defense but in retaliation, the excessive use of force renders one the [aggressor]; a nonaggressor has a duty not to become the aggressor." (Internal quotation marks omitted.) *Id.*

¶ 50    "The purpose of jury instructions is to provide jurors with correct principles of law that apply to the evidence that has been submitted to them." *People v. Bauer*, 393 Ill. App. 3d 414, 423 (2009). Given defendant's self-defense claim, the trial court instructed the jury on the elements of the aggravated discharge of a firearm offense and the law of self-defense. As an element of the offense, it instructed the jury that the State was required to prove "[t]hat the Defendant was not justified in using the force which he used," pursuant to IPI Criminal 4th No. 24-25.06(A). It gave the jury the self-defense instruction, IPI Criminal 4th No. 24-25.06, informing the jury that,

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force.

> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another."

¶ 51    The trial court properly instructed the jury on defendant's self-defense theory of the case and on justification. Had the jury believed defendant was justified in his use of deadly force against Lee, it could have found him not guilty. Even had counsel requested, and the jury been given, an additional instruction that "[a] person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor" (IPI Criminal 4th No. 24-25.09X), we find no reasonable probability that the result of defendant's proceeding would have been different. Ultimately, the question for the jury came down to whether defendant's belief that he needed to respond to Lee's actions by discharging his firearm seven

times was objectively reasonable. The fact that defendant, if not the initial aggressor, had no duty to retreat does not impact that determination.

¶ 52    Ultimately, an overwhelming amount of evidence contradicted defendant's account that he acted in self-defense. At trial, defendant testified that Lee drove aggressively and bumped his vehicle into the vehicle defendant and his then-girlfriend occupied. According to defendant, he discharged his firearm seven times at Lee's vehicle after he saw Lee point a firearm in his direction. Responding police officers, however, found no evidence of a firearm on Lee's person or in his vehicle. Rather, they did find the firearm that defendant placed on the trunk of his vehicle, seven shell casings from the ground around the scene, five bullet fragments recovered from inside Lee's vehicle, and one bullet fragment in Lee's vehicle. All seven shell casings and two bullet fragments were determined to have been discharged by defendant's firearm, while the remaining ballistic evidence was either inconclusive or not suitable for comparison. No other firearm was recovered from a search of the scene. The physical evidence indisputably showed that defendant fired multiple rounds at Lee and no physical evidence was recovered showing Lee had a firearm.

¶ 53    Lee driving aggressively on the road did not justify excessive force, *i.e.*, defendant firing seven rounds of ammunition at Lee's vehicle in a matter of seconds. *Guja*, 2016 IL App (1st) 140046, ¶ 54. Moreover, defendant was significantly impeached regarding the plausibility of his self-defense theory premised on Lee pointing a firearm at the Cruze by both physical evidence and testimony. Defendant's phone calls to police contradicted his testimony. He stated in the first phone call that someone had tried to run him off the road and he responded by "firing upon" the vehicle. He did not mention the occupant of the other vehicle displaying a firearm. In his second call, defendant eventually mentions that he thought he saw the other driver reach for "something,"

but again never mentions he saw the driver point a firearm at him and Wilson. The State's rebuttal evidence demonstrated that defendant previously told an officer that he saw Lee's silhouette through the Yukon's tinted windows and believed Lee *may* have had a weapon. Defendant never told the authorities at the scene that Lee pointed a firearm at him. The only firearm recovered belonged to defendant, and there also was no evidence of vehicular damage matching defendant's claim that Lee had driven his vehicle into the back of the Cruze.

¶ 54    Overall, defendant's self-defense claim was defeated because the evidence overwhelmingly showed that defendant's belief that he needed to discharge a firearm seven times at Lee's vehicle in response to Lee's conduct was not objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50. Under the second S*trickland* prong, a reasonable probability that, but for counsel's deficient performance, the result of trial would have been different "is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004). We cannot find that failure to instruct the jury that a noninitial aggressor has no duty to retreat alone threatened to tip the scales of justice against him given defendant's response to Lee's conduct. See *Guja*, 2016 IL App (1st) 140046, ¶ 54 (an individual is rendered the aggressor where he "responds to a confrontation with such excessive force that one is no longer acting in self-defense but in retaliation"). Had the additional jury instruction been given, we find no reasonable probability that the jury would have returned a not guilty verdict. *People v. Williams*, 391 Ill. App. 3d 257, 271 (2009); see *People v. White*, 265 Ill. App. 3d 642, 651 (1994) (noting that a defendant raising an ineffective assistance of counsel claim may not merely assert that the

jury " 'might have' applied a duty to retreat when it considered his self-defense claim," as such an argument is merely speculative).

¶ 55                    B. Trial Court's Failure to Comply with Rule 431(b)

¶ 56    Defendant next asserts that the trial court failed to comply with Rule 431(b) in admonishing the prospective jurors when the court failed to ask whether they both "understand and accept" the four principles outlined in Rule 431(b).

¶ 57    Defendant acknowledges that he did not preserve this issue for appeal, as there was no contemporaneous objection at the time and the claim of error was not raised in a posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 47. Nonetheless, he asserts that we may also excuse forfeiture of this issue under the first prong of the plain-error doctrine because the evidence at trial was closely balanced. The State concedes that an error occurred but asserts there was no first-prong plain error.

¶ 58    We agree with the parties that an error occurred, as the trial court failed to comply with Rule 431(b) by asking each "potential juror, individually or in a group, whether the juror understands and accepts" the four principles outlined in Rule 431(b). See Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see also *People v. Wilmington*, 2013 IL 112938, ¶ 32. However, defendant cannot satisfy the requirements of first-prong plain error as the evidence at trial of self-defense was not closely balanced.

¶ 59    Under the closely balanced prong of the plain-error doctrine, the defendant must show "that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). "If the defendant carries that burden, prejudice is not presumed; rather, [t]he error is actually prejudicial." (Internal

quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 51. When considering whether the evidence at trial was closely balanced, "a reviewing court must undertake a commonsense analysis of all the evidence in context." *Belknap*, 2014 IL 117094, ¶ 50. This entails "an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 60    We have already analyzed the quantum of evidence against defendant in our discussion of defendant's jury instruction claim and do no reiterate it here. We do not find, as defendant contends, that the evidence amounts to a mere contest of credibility over defendant's and Lee's version of events; the physical evidence indisputably showed that defendant fired multiple rounds at Lee and no physical evidence was recovered showing Lee even had a firearm. See *Sebby*, 2017 IL 119445, ¶¶ 60-63 (a contest of credibility exists where both sides presented evidence that was "largely consistent," neither version of events was less plausible than the other, and there was no extrinsic evidence to corroborate or contradict either version). Suffice it to say, we do not find the evidence closely balanced such that the outcome of trial would have been any different had the court properly asked the jury members whether they both understood and accepted the four principles outlined in Rule 431(b). Therefore, we must also honor the forfeiture of this issue on appeal. *People v. Leach*, 2012 IL 111534, ¶ 61.

¶ 61                                III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 63    Affirmed.